# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                    )
UNITED STATES OF AMERICA,           )
*ex rel.* DANI SHEMESH,             )
                                    )   **FILED UNDER SEAL**
            Plaintiffs,             )
                                    )
       v.                           )   Case No. 09-1600-ESH
                                    )
CA, INC.,                           )   **JURY TRIAL DEMANDED**
                                    )
            Defendant.              )
_____)

# SECOND AMENDED COMPLAINT
## (False Claims Act, 31 U.S.C. §§ 3729 *et seq.*)

# INTRODUCTION

This lawsuit alleges that Defendant CA, Inc. ("CA") has defrauded the General Services Administration ("GSA") and other federal agencies in connection with the defective pricing of computer software products and maintenance. Specifically, although CA was required to disclose to the United States the discounts available to certain categories of customers, CA did not do so, which resulted in federal Government purchasers paying substantially higher prices than other similarly situated non-Government customers who purchased the same items. The United States has intervened in this lawsuit and, on March 24, 2014, filed a Complaint in Intervention. As set forth herein, Plaintiff Dani Shemesh, by the undersigned counsel and acting on behalf of and in the name of the United States of America, brings this civil action under the *qui tam* provisions of the federal False Claims Act, adopts the allegations set forth in the United States' Complaint in Intervention, as well as the claims asserted therein under the False Claims Act, and further alleges:

**RELATOR ADOPTS UNITED STATES' COMPLAINT IN INTERVENTION**

1.     Relator hereby adopts the Complaint in Intervention filed in this action by Plaintiff the United States.  Relator incorporates all of the allegations in the Complaint in Intervention (Paragraphs 1-122), as well as all the claims for relief asserted under the False Claims Act (Paragraphs 123-136), as though fully set forth herein.

2.     In addition to the allegations and claims that Relator adopts from the United States' Complaint in Intervention, Plaintiff brings additional allegations and claims, as set forth below.

**JURISDICTION AND VENUE**

3.     Counts   I-II of this Second Amended Complaint  ("Complaint") are civil actions by Plaintiff Dani Shemesh, acting on behalf of and in the name of the United States, against Defendant CA, Inc., under the False Claims Act, 31 U.S.C. §§ 3729 *et seq*.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. § 3732(a).

4.     This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a), because that section authorizes nationwide service of process, and because the Defendant regularly transacts business in this judicial district.

5.     Venue is proper in this judicial district pursuant to 31 U.S.C. § 3732(a), because the Defendant regularly transacts business in this judicial district and some of the unlawful acts described herein occurred in this judicial district.

6.     None of the allegations set forth in this Complaint is based on a public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or General Accounting Office report, hearing, audit, or investigation, or from the news media.

7.     Plaintiff Dani Shemesh has direct and independent knowledge, within the meaning of 31 U.S.C. § 3730(e)(4)(B)(2009), derived through his employment as head of the sales division for CA Software Israel, Ltd. ("CA Israel"), a wholly-owned subsidiary of Defendant CA, Inc., of the information on which the allegations set forth in this Complaint are based, and he has voluntarily provided the information to the Government prior to the filing of this Complaint and prior to any public disclosures of the allegations or transactions set forth herein.

### PARTIES AND OTHER RELATED PERSONS

8.     Plaintiff Dani Shemesh ("Relator" or "Shemesh"), was the head of the technology and services division for CA Software Israel Ltd., a wholly-owned subsidiary of CA, Inc., from May 2004 until September 2006.  From September 2006 until December 31, 2008, Shemesh was head of the sales division for CA Software Israel, Ltd.

9.     Defendant CA, Inc. ("CA"), formerly known as "Computer Associates, Inc.," and sometimes referred to as "CA Technologies, Inc.," is incorporated in the State of Delaware and has its headquarters at One CA Plaza, Islandia, New York 11749.  CA is in the business of selling computer software licenses and maintenance.  At all times relevant to this Complaint, CA has transacted business in the District of Columbia.  All the activities described in this Complaint were undertaken by, or at the direction of, agents or employees of Defendant CA, Inc. acting within the scope of their agency or employment with, and for the benefit of, CA.

10.     The United States General Services Administration ("GSA") is an agency of the United States, responsible for entering into and administering contracts for the procurement of various items, including computer software licenses and maintenance, by employees and agents

of various United States agencies.  The headquarters of GSA is located at 1800 F Street NW,

Washington, DC 20405.

## STATUTORY AND REGULATORY BACKGROUND

### A.  GSA Multiple Award Schedule Contracts

11.     The Government as a whole is a very large consumer of certain commercial items

such as computer software licenses.  In order to make it possible for multiple Government

agencies or offices to purchase these items without the necessity of each separate agency or

office having to negotiate a separate procurement contract with the vendor, the Government,

acting through GSA, often uses a contracting mechanism known as a Multiple Award Schedule

("MAS") contract.  Through this mechanism, GSA can enter into contracts with vendors who

offer similar supplies or services, whereby GSA and each of the vendors agree to a fixed price

for each commercial item.  *See* General Services Acquisition Manual ("GSAM") § 552.212-

73(a); Federal Acquisition Regulation ("FAR") § 52.202-1.  When a Government agency or

office wishes to purchase a commercial item that is part of a MAS contract, the agency or office

may choose to purchase the item from any of the vendors with whom GSA has a contract, at the

price that was previously negotiated between the vendor and GSA.  Also, using the discounts

offered to GSA as a base and incorporating the other terms of the MAS contract, federal agencies

may enter into blanket purchase agreements ("BPAs") under which the agencies can seek even

greater price reductions than the standard GSA discounts.

12.     The objective of GSA, when negotiating a MAS contract, is to take advantage of

the fact that the federal Government, taken as a whole, is a very large purchaser of goods and

services.  Consequently, GSA should be in a position to take advantage of the bargaining

position usually available to a very large customer, even though any individual Government

4

office or agency, standing alone, may not purchase large quantities of any particular product. Thus, when negotiating a MAS contract, "[t]he Government will seek to obtain the offeror's best price (the best price given to the most favored customer)."  GSAM § 538.270(a).

13.     As part of the process of negotiating a MAS contract, the vendor is supposed to provide the Government with a catalog that lists the vendor's established prices for commercial items, and in addition, to disclose truthful and accurate information about the pricing and discounts available to the vendor's commercial customers.  GSA and the vendor then negotiate contract prices for the items as a discount from the established catalog prices.  GSAM § 538.271(a).  As part of this process, GSA is supposed to compare the terms and conditions offered to the Government with the terms and conditions of the vendors' agreements with its other commercial customers.  GSAM § 538.70(c).  If the vendor does not offer its "best price" to the Government, the vendor is supposed to identify and explain the reason for any difference between the price offered to the Government and the price offered to other more favored customers.  GSAM § 538.270(c)(7).

14.     If GSA awards a contract containing pricing that is less favorable than the best price offered to commercial customers for similar purchases, the GSA official must make a determination that the prices offered to the Government were "fair and reasonable, even though comparable discounts were not negotiated," and that the award was "otherwise in the best interest of the Government."  GSAM § 538.270(d).  The GSA official must document the negotiation and the determination, GSAM § 538.271(b), and must "[s]tate clearly in the award document the price/discount relationship between the Government and the identified commercial customer (or category of customers) on which the award is predicated."  GSAM §538.271(c).

15.     After the MAS contract is awarded, throughout the time period covered by the contract, the vendor is required to maintain "the negotiated price/discount relationship (and/or term and condition relationship) between the eligible ordering activities and the offeror's customer or category of customers on which the contract award was predicated." GSAM § 538.272(a); *see* FAR § 52.238-75. "If a change occurs in the contractor's commercial pricing or discount arrangement applicable to the identified commercial customer (or category of customers) that results in a less advantageous relationship between the eligible ordering activities and this customer or category of customers, the change constitutes a 'price reduction.'" GSAM § 538.272(a). The vendor must report to GSA all such price reductions. GSAM § 538.272(b); FAR § 52.238-75.

16.     Government procurement contracts typically incorporate a provision, known as a "Price Reduction Clause," which requires the contractor to reduce prices to the Government, prospectively and/or retroactively, to give the Government the benefit of any price reductions given to other comparably-situated commercial customers during the period covered by the contract. *See, e.g.,* FAR § 52.215. GSA's Multiple Award Schedule contracts include a Price Reduction Clause, set forth in GSAM § 552.238-75, which states:

> (a) Before the award of a contract, the Contracting Officer and the Offeror will agree upon (1) the customer (or category of customers) which will be the basis of award, and (2) the Government's price or discount relationship to the identified customer (or category of customers). This relationship shall be maintained throughout the contract period. Any change in the Contractor's commercial pricing or discount arrangement applicable to the identified customer (or category of customers) which disturbs this relationship shall constitute a price reduction.
>
> (b) During the contract period, the Contractor shall report to the Contracting Officer all price reductions to the customer (or category of customers) that was the basis of award. The Contractor's report shall include an explanation of the conditions under which the reductions were made.
>
> (c)   (1) A price reduction shall apply to purchases under this contract if, after the date negotiations conclude, the Contractor –

(i) Revises the commercial catalog, pricelist, schedule or other document upon which contract award was predicated to reduce prices;

(ii) Grants more favorable discounts or terms and conditions than those contained in the commercial catalog, pricelist, schedule or other documents upon which contract award was predicated; or

(iii) Grants special discounts to the customer (or category of customers) that formed the basis of award, and the change disturbs the price/discount relationship of the Government to the customer (or category of customers) that was the basis of award.

(2) The Contractor shall offer the price reduction to the Government with the same effective date, and for the same time period, as extended to the commercial customer (or category of customers).

(d) There shall be no price reduction for sales –

(1) To commercial customers under firm, fixed-price definite quantity contracts with specified delivery in excess of the maximum order threshold specified in this contract;

(2) To Federal agencies;

(3) Made to State and local government entities when the order is placed under this contract (and the State and local government entity is the agreed upon customer or category of customer that is the basis of award); or

(4) Caused by an error in quotation or billing, provided adequate documentation is furnished by the Contractor to the Contracting Officer.

(e) The Contractor may offer the Contracting Officer a voluntary Government-wide price reduction at any time during the contract period.

(f) The Contractor shall notify the Contracting Officer of any price reduction subject to this clause as soon as possible, but not later than 15 calendar days after its effective date.

(g) The contract will be modified to reflect any price reduction which becomes applicable in accordance with this clause.


## FACTUAL ALLEGATIONS

### A.  Overview of the Products Most Commonly Sold By CA

17.  CA is one of the leading manufacturers of software for use on large, "mainframe" computer systems.  CA also manufactures and sells non-mainframe software.  Most of the products sold by CA fall under one of three categories: (a) term software licenses; (b) perpetual software licenses; and (c) maintenance.

7

18.     A customer usually purchases a software license once, to use on a specific machine that has a specific capacity and configuration.  A customer might purchase additional licenses in order to upgrade existing machines or to use on additional machines.

19.     In conjunction with the purchase of a software license, a customer usually purchases one or more years of annual "maintenance" for the license.  By purchasing maintenance, the purchaser of a term software license receives the right, during the year(s) covered by the maintenance contract, to continue using the software license.  In addition, by purchasing maintenance, the purchaser of either a term software license or a perpetual software license is purchasing the right to receive any applicable fixes or upgrades to the original software product.  CA uses the term "maintenance" to refer to transactions involving "maintenance fees," "usage and maintenance fees," "time," and/or "renewal."

20.     Each software product in CA's pricing list has an associated maintenance rate.  For mainframe products, the maintenance rates range between 12% and 25% of the cost of the associated software license (most of the time, the rate is between 15% and 20%).  For non-mainframe products, the maintenance rate is usually 20% of the associated software license.

21.     Under CA's normal pricing practice for maintenance contracts, when a non-Government commercial customer purchases a year of maintenance, the customer is charged the maintenance rate as a percentage of the amount the customer **actually paid** for the underlying software product.  Thus, for example, if the catalog list price for a software license was $100, and the customer bought the license for $50 (*i.e.*, at a discount of 50% off the list price), and the maintenance rate for the product was 20% of the price of the underlying product, then the customer would be charged an additional $10 per year for the maintenance contract (*i.e.*, 20% of the price actually paid for the software product).  Or, if the customer bought the term license for

$20 (*i.e.*, at discount of 80% off the list price), then the customer would be charged an additional $4 per year for the maintenance contract.  Put another way, if CA sells software products to a commercial customer at a specified level of discount, the customer usually receives a similar discount on the purchase of maintenance.

B.  CA's Government Contracts Required the Disclosure of Discounting Practices.

22.     Effective on or about September 26, 2002, CA entered into a Multiple Award Schedule contract, Contract No. GS-35F-0823M, with GSA (the "primary GSA contract"). Under the primary GSA contract, various federal agencies, offices, and entities have purchased hundreds of millions of dollars of items since 2002, without having to enter into separate negotiations over price.

23.     Contract Number GS-35F-0823M covers the sale of five types of products:  (1) Special Item Number ("SIN") 132-32, Term Software Licenses; (2) SIN 132-33, Perpetual Software Licenses; (3) SIN 132-34, Maintenance of Software; (4) SIN 132-50, Training Courses; and (5) SIN 132-51, Information Technology Professional Services, *i.e.*, consulting services.

24.     The items offered for sale under Contract Number GS-35F-0823M fall under the GSA classification of "General Purpose Commercial Information Technology Equipment, Software and Services," which is otherwise known as "Group 70."  In order to submit an offer for a MAS contract under Group 70, CA was required to submit to GSA the form known as Form CSP-1, "Commercial Sales Practices Format."

25.     In item no. 3 on Form CSP-1, CA was asked the following question:  "Based on your written discounting policies (standard commercial sales practices in the event you do not have written discounting policies), are the discounts and any concessions which you offer the Government equal to or better than your best price (discount and concessions in any

9

combination) offered to any customer acquiring the same items regardless of quantity of terms and conditions?  YES ___   NO _____."

26.     If an "offeror" such as CA answers "NO" to the question in item no. 3 on Form CSP-1, then the offeror has to provide detailed information about circumstances in which customers receive more favorable prices than the Government, including the quantities/volumes involved, and the nature of whatever discounts or concessions are provided.  The offeror has to provide information that is, to the best of the offeror's knowledge and belief, "current, accurate, and complete as of 14 calendar days prior to its submission."  The offeror is also required to disclose any changes to its price lists, discounts, or discounting policies which occur between the time it submits its offer and the close of negotiations.

27.     Since entering into Contract No. GS-35F-0823M with GSA, CA has entered into BPAs with other agencies, including, for example, BPA Contract No. AG-3142-B-06-0019 dated March 31, 2006, with the Department of Agriculture.  These BPAs incorporate the basic terms and conditions of Contract No. GS-35F-0823M, use the discounts provided under that contract as a base, and then can provide even greater discounts than those established in the primary GSA contract.  These BPAs can also include additional pricing assurances such as "most favored customer" clauses.  For example, Contract No. AG-3142-B-06-0019 states: "No client is provided rates more favorable than those provided to the USDA under this BPA for the same licensed products under the same use terms, conditions, volumes or restrictions."  By engaging in the misconduct described herein with respect to Contract No. GS-35F-0823M, CA unlawfully inflated the prices charged not only to Government purchasers who ordered products directly under that MAS contract, but also to those who ordered products under BPAs which incorporate the terms and conditions of that MAS contract.

C.  CA's Pricing and Discounting Practices.

28.     In its dealings with Government purchasers, CA points to its "list prices" as a

reference point for pricing, and then provides varying degrees of discounts off the list prices.  In

general, under CA's contracts with GSA and other federal agencies, Government purchasers

have received discounts ranging from 35-55% off CA's list prices for software licenses, and 10-

15% off CA's list prices for maintenance.

29.     In CA's dealings with its non-Government commercial customers, however, there

is little if any relationship between CA's so-called "list prices" and the prices that CA actually

charges for its products.  As one senior CA official, Jose Carvalho, said in a November 30, 2006

e-mail to another senior CA official, Patrick Stark:  "Our customers do not know CA's price list

not even for the product they licensed.  In many case (sic), the prices list is 'obscene' and we end

up doing discounts around 90% without ever telling customer this."  In other words, CA

commonly offered customers prices that were only a small fraction of CA's list prices, with

discounts that frequently exceeded 90% off the list prices of both software licenses and

maintenance.

30.     In or about October 2007, CA's Strategic Pricing and Licensing Office created

and circulated a document called "Mainframe Software Pricing."  This document candidly stated

that CA's list prices in effect at the time were "linear," *i.e.*, not related to volume, and were

"unrealistic."  As a consequence, the document states, "linear pricing required huge discounts."

Slide 11 of this document is a chart entitled "Time Transactions -- MIPS Level Versus MIPS

Value."  This chart demonstrates that CA's customers throughout all regions of the world,

including the United States, were getting huge discounts off CA's list prices for maintenance

(*i.e.*, "time transactions").  These discounts frequently exceeded 90% off the list price.

31.     Relator was personally involved in many small deals in which CA customers received discounts greater than 75% off the list prices.  Relator was also involved in large deals in which the customers received discounts greater than 90% off the list prices.  In order to get significant discounts approved, Relator simply had to tell CA company officials that the deal was "a strategic deal," or that "if we don't give the discount we will lose the deal."

32.     For example, in a deal to sell a mainframe product to customer Discount Bank, Relator needed the approval of CA's corporate office to provide a discount of 86% off the list price.  On July 16, 2008, David Corbett wrote to Patrick Starck, the Corporate Senior Vice President in charge of Regional Sales for Europe, Middle East and Africa ("EMEA"), seeking approval for the discount.  To justify the discount, Corbett wrote: "If we do not approve this price we have lost this deal.  The discount at 86% is very reasonable for mainframe."

33.     Relator learned that there was <u>no distinction</u> between CA's discounting practices within Israel and its discounting practices world-wide, including within the United States.  He learned that CA maintains only one "list" containing the so-called "list prices" used throughout the entire world, and that CA's world-wide discounting policies were uniform insofar as they involved levels of discounts from a single pricelist.  In general, for any discount, regardless of geographic location: (1) if the level of discount was 50% or less, it could be approved by the regional sales manager; (2) if the level of discount was greater than 50% but did not exceed 74%, then the discount had to be approved by an "area manager" (*i.e.*, one of four large sales areas within the United States, or EMEA, etc.); (3) if the level of discount exceeded 74% off the list price, it had to be approved by Allan Clayton, Senior Vice President responsible for world-wide pricing.  Clayton often approved discounts to customers that exceeded 74% off the list price, and on some occasions, Clayton approved discounts that even exceeded 90% off the list price.

12

34.     On or about October 17, 2007, Relator was in a business meeting in Herzlia with Marci Ginzburg, CA's Senior Vice President for Global Customer Portfolio Management, and several other people.  The primary purpose of the meeting was for Ilan Nimni, the sales manager responsible for a proposed $15 million deal with the Government of Israel, to brief Ginzburg -- who reported directly to George Fischer, CA's Executive Vice President for Global Sales – on the status of the proposed deal, and to discuss how CA could assist its subsidiary CA Israel in resolving any remaining business obstacles.  Under the proposed deal with the Government of Israel, CA was considering selling software at a discount of as much as 80-90 percent off the list price.  When asked whether corporate headquarters was likely to approve such a large discount, Ginzburg indicated that approval was not a problem, and that such discounts were a "common practice."

35.     Relator is personally aware that CA entered into contracts to provide computer software and software maintenance to several U.S.-based companies, including Merck, Avon, Affiliated Computer Services, Bank of America, Citibank, and WalMart.  Based on his knowledge of CA's sales and discounting practices, as well as internal CA documents, Relator alleges that each of these customers received much more favorable discounts on software licenses and maintenance than was provided to Government purchasers under the primary GSA contract or other related Government contracts.

D.  CA Charged Higher Prices to Government than to Comparable Commercial Customers.

36.     Relator personally participated in numerous deals to provide software licenses and maintenance to large and small customers, in deals of various sizes, in Israel at discounts far greater than 50% off the list prices.  In addition, Relator has reviewed internal CA documents that demonstrate that CA was providing software licenses to large and small customers in the

13

United States, in large and small deals, at discounts far greater than 50% off the list prices. These discounts covered the same items that were sold under the primary GSA contract and other related Government contracts for much less favorable discounts.

37.     CA also offered Government customers a much less favorable pricing formula than it offered non-Government customers for "maintenance" sold under Government contracts. As noted above, CA's standard practice is to sell maintenance as a percentage of the **actual sales price** that the commercial customer paid for the corresponding software license.  Thus, suppose a commercial customer was paying only 50% of the list price for a software license, and the list price for maintenance was 20% of the list price for the corresponding license.  CA's standard practice would be to sell the customer annual maintenance for 20% of the **actual sales price** of the license, which, in this example, would be only 10% of the full list price of the license. However, under the MAS contract, for example, CA sells maintenance to U.S. Government customers at prices ranging between 10-18% of the **full list price** of the corresponding software license.  For example, suppose the Government was paying 50% of the list price of a software license, and the Government's maintenance rate for the product was 18%.  CA would sell the Government the annual maintenance for 18% of the **full list price** (rather than 20% of the actual sales price) of the license.  Thus, even though CA purported to offer Government customers a "better discount" (*i.e.*, higher percentage reduction) on the maintenance rate than CA was offering to other customers, this so-called "discount" was a sham because the Government's "maintenance rate" was applied to an inflated base price.  It is noteworthy that most of CA's sales revenues, from Government and non-Government customers alike, comes from the sale of maintenance rather than software licenses; consequently, the Government suffers significant financial harm as the result of CA's unfair pricing practices for maintenance.

14

38.     In summary, under the primary GSA contract as well as other related Government contracts, Government customers generally received discounts for software licenses and maintenance that were less favorable than those offered to a wide variety of other commercial (*i.e.*, non-Government) customers.  Five illustrative examples involving sales to customers in Israel are described in the paragraphs immediately below, as well as in a table attached hereto as Exhibit 1.

39.     The first example involves CA Part No. TOPSEC002, a software license sold to Government customers under the primary GSA contract, and also sold to a non-Government customer, Bank Leumi.  The "list price" of the software license is $68,974.00; GSA's price is $34,487.00, a discount of 50% from the list price; Bank Leumi's price is $3,400.42, a discount of 95.07%.  The "list price" of maintenance for this license is $10,346.10; GSA's price for maintenance is $8,966.62, a discount of 13.33% from the list price; Bank Leumi's price for maintenance is $253.48, a discount of 97.55%.

40.     The second example involves CA Part No. TLMBAS002, a software license sold to Government customers under the primary GSA contract, and also sold to a non-Government customer, Bank Leumi.  The "list price" of the software license is $46,809.00; GSA's price is $23,404.50, a discount of 50% from the list price; Bank Leumi's price is $2,307.68, a discount of 95.07%.  The "list price" of maintenance for this license is $7,021.35; GSA's price for maintenance is $6,085.17, a discount of 13.33% from the list price; Bank Leumi's price for maintenance is $172.02, a discount of 97.55%.

41.     The third example involves CA Part No. PLABAS002, a software license sold to Government customers under the primary GSA contract, and also sold to a non-Government customer, Isracard.  The "list price" of the software license is $73,735.00; GSA's price is

$36,867.50, a discount of 50% from the list price; Isracard's price is $13,220.69, a discount of 82.07%.  The "list price" of maintenance for this license is $14,747.00; GSA's price for maintenance is $13,272.30, a discount of 10% from the list price; Isracard's price for maintenance is $2,644.14, a discount of 82.07%.

42.     The fourth example involves CA Part No. EZTBAS002, a software license sold to Government customers under the primary GSA contract, and also sold to a non-Government customer, Isracard.  The "list price" of the software license is $63,398.00; GSA's price is $31,669.00, a discount of 50% from the list price; Isracard's price is $11,367.26, a discount of 82.07%.  The "list price" of maintenance for this license is $11,411.64; GSA's price for maintenance is $10,143.68, a discount of 11.11% from the list price; Isracard's price for maintenance is $2,046.11, a discount of 82.07%.

43.     The fifth example involves CA Part No. ENDPRC990-0, a software license sold to Government customers under the primary GSA contract, and also sold to a non-Government customer, Bezeq.  The "list price" of the software license is $53,000.00; GSA's price is $25,000.00, a discount of 52.83% from the list price; Bezeq's price is $8,760.90.68, a discount of 83.47%.  The "list price" of maintenance for this license is $10,600.00; GSA's price for maintenance is $9,000.00, a discount of 15.09% from the list price; Bezeq's price for maintenance is $1,752.18, a discount of 83.47%.

44.     Relator also has several examples, based on internal CA documents, that illustrate how CA was charging higher prices to Government customers than it was charging other large and small commercial customers for transactions in the United States involving software licenses and maintenance.

45. Generally, for new mainframe products, CA gave Merck a discount of 94.09% off the list price for software licenses and for maintenance of those products. By contrast, for those products at that time, CA would generally give Government customers a discount of only 35% off the list price for the software licenses, and only 10-15% off the list price for the maintenance of those products. For "pre-existing" mainframe products, CA generally gave Merck a discount of 62.49% off the list price for maintenance, while CA gave Government customers a discount of only 14% off the list price for maintenance.

46. To illustrate how Merck was given much more favorable pricing than Government customers, one can look at several specific products included in both the Merck contract and the GSA schedule. First, consider the price Merck and GSA paid for maintenance for Part No. INTBAT002, a software license. The "list price" for this software license was $34,390.00, and the "list price" for maintenance of this product was 20% of the list price of the license, *i.e.*, $6,878 per year. CA would sell maintenance for this license to GSA for $6,190.20, a discount of 10% from the list price. By contrast, CA was selling maintenance on this product to Merck for $2,871.56; a discount of 58.25% from the list price. Second, consider the price Merck and GSA paid for both the software license and the maintenance for Part No. PLABAS002. The "list price" for the software license in 2005 was $69,562.00. CA was selling this software license to GSA for a discount of 35%. By contrast, CA was selling the same license to Merck for $3,304.19, a discount of 95.25% off the list price. For this product, the "list price" for maintenance was 20% of the price of the software license, *i.e.*, $13,912.40. CA would sell maintenance to GSA for $12,521.16, a discount of 10% off the list price, while CA was selling maintenance to Merck for $660.83, a discount of 95.25% off the list price.

47.     CA gave its customer Avon a discount of 63% off the "contracted rates" for new mainframe software licenses, and a discount of 11% off the "contracted rates" for "time" (*i.e.*, maintenance) for the licenses.  The term "contracted rate" refers to the discount level which, in a prior contract between CA and a customer, would be guaranteed for future business dealings.  In Avon's case, it was already guaranteed a discount of 20% off the list price for new software products, so an additional 63% off the "contracted rate" for new main frame software products meant a net discount of 70.4% off the list price for those products.  For the purchase of maintenance or additional "capacity" (i.e., more of the same product that the customer had previously purchased), Avon already had a guaranteed discount of 80.67% off the list price, so an additional 11% discount for "time" (maintenance) meant a net discount of 82.80% off the list price.  By contrast, CA generally would give GSA a discount of 35% off the list price for new products (or additional "capacity"), and 10-15% off the list price for maintenance.

48.     In 2003, CA entered into a $360,000 deal with its customer Affiliated Computer Services, Inc. ("ACS") for the initial purchase of a software product and two years of maintenance; CA entered into a follow-up deal with ACS in 2005 for continued maintenance.  Under the initial contract, ACS purchased 15,000 software licenses for $270,000 ($18 per license), plus maintenance for two years at $45,000 per year ($3 per license per year).  The list price for these software licenses was $12,778.00 per license; the list price for maintenance on the product was 20% of that amount, or $2,555.60 per license.  Under the terms of the follow-up contract, CA charged ACS only $3.32 per license for the maintenance, a discount of 99.87% off the list price.  The same product -- CA Part No. ASMNGT990-9 -- was also offered to Government customers under the MAS contract.  The price on the GSA schedule, as of 2008,

was $6,772.00 per license for the software product, and maintenance was $2,300.04 per license

per year (based on the product list in effect in 2005).

### E.  CA Failed to Disclose Required Pricing Information to the Government.

49.     The examples described above demonstrate a pattern whereby Government

purchasers have been paying far higher prices than CA's other commercial customers for the

very same products.  Through his personal experience as a sales division director for a CA

company, Relator knows that CA offered better discounts to a wide variety of customers, large

and small, with such discounts applicable to all CA items that the customer might purchase,

regardless of the quantity of a particular item or the total volume of products ultimately

purchased.  These better discounts were offered to customers who purchased several millions of

dollars' worth of CA products, as well as those who purchased less than $500,000 of products.

In short, these discounts were available to all types of CA customers, including those who were

comparable to U.S. Government purchasers.

50.     Based on his personal observations and knowledge of CA's sales practices, his

knowledge of the prices incorporated in the primary GSA contract and other Government

contracts, and the rules and policies governing the Government's negotiation of prices, Relator

alleges that CA cannot have disclosed to the Government the true nature of its pricing and

discounting practices with respect to comparably situated non-Government customers, either

before or after the award of Contract No. GS-35F-0823M or other Government contracts.

51.     Relator further alleges that if, prior to award of the Government contracts, CA had

disclosed the true nature of its pricing and discounting practices with respect to comparably

situated non-Government customers, then the Government would have negotiated better prices in

the contracts.  Moreover, Relator alleges that if, subsequent to the award of the Government

contracts, CA had disclosed to the Government the true nature of its pricing and discounting practices with respect to comparably situated non-Government customers, then the Government would have invoked the "Price Reduction Clause" of those contracts, lowered the prices charged by CA to Government customers, and demanded refunds of amounts that had been overcharged to Government customers.

<u>F.  Specific False Statements Made by CA to GSA.</u>

52.     As alleged in paragraph 45 of the United States' Complaint in Intervention: CA represented in the November 30, 2001 CSP that it "does not discount [maintenance fees] or [user maintenance fees] to the commercial end-user class of customer."

53.     CA knew that this statement about maintenance discounts in the November 30, 2001 CSP -- *i.e.*, that it did not discount maintenance fees or user maintenance fees to commercial end-user customers -- was <u>false</u>.  At the time CA made this statement, CA routinely provided its commercial end-user customers with significant discounts off the full list price of maintenance fees.  In fact, as described above, CA's standard practice was to provide commercial end-users with the <u>same</u> <u>discount</u> off the full list price of maintenance fees that CA provided with respect to the associated licenses.

54.     In an e-mail that was written in October 2001 -- about the same time that CA made this false statement – Andrew Hill, who was CA's head of global sales, approved a transaction between CA and LeumiCard in which the total discount on list price maintenance was 51%.

55.     Another email chain documented a deal in December 2001 between CA and Supersol, in which CA provided Supersol with a 30% discount off the list price of maintenance.

56.     Another email chain, written in July 2002, documented the approval of a deal between CA and Cellcom in which CA sold licenses at a discount of 36% off the list price, and CA provided an even greater discount off the maintenance price.

57.     As alleged in paragraph 46 of the United States' Complaint in Intervention: In a September 20, 2002 letter to GSA, which was incorporated into the contract, CA made its Final Proposal Revision, setting forth CA's pricing and discounts for Term Software Licenses, Perpetual Software Licenses, and Maintenance. … For SIN 132-34, CA offered to discount maintenance by two points off the percentage of the license fee charged for maintenance, which was accepted by GSA.  CA represented that this would result in a "10% or greater discount from [CA's] standard basis for establishing such fees."  CA further represented that "Government discounts will not fall below awarded discount levels."

58.     CA knew that its statement in the September 20, 2002 letter to GSA -- *i.e.*, that GSA would be receiving a "10% or greater discount from [CA's] standard basis for establishing such fees" -- was <u>false</u>.  In fact, as described above, CA's standard basis for establishing maintenance fees for commercial end-users was to provide them with the <u>same</u> <u>discount</u> off the full list price of maintenance fees that CA provided with respect to the associated licenses.

<u>G.  CA Submitted False Claims to the U.S. Government.</u>

59.     As the result of CA's improper concealment of pricing and discounting information that CA was legally required to disclose to the Government, the Government contracts contain inflated prices for CA's products.  Consequently, beginning in 2002, Government customers have paid at least one hundred million dollars of overpayments to CA for the purchase of the software licenses and maintenance sold pursuant to the contracts.

60.     For an example of a false claim submitted by CA in connection with a specific transaction, consider the BPA between CA and the Department of Agriculture, Contract No. AG-3142-B-06-0019, dated March 31, 2006.  Because of CA's false statements to GSA about the pricing of maintenance in the negotiations preceding the 2002 contract, GSA agreed to receive far smaller discounts on maintenance than GSA would have bargained for if it had known CA's true discounting practices.  In negotiating the BPA with CA, the Department of Agriculture used the GSA discount level as a starting point, and then negotiated further discounts; consequently, CAs false statements to GSA in 2001 and 2002 resulted in the Department of Agriculture agreeing to under the BPA that was negotiated in 2006.  An initial call order for licenses and maintenance under the BPA was placed on March 31, 2006, in the amount of $1,835,023.50, nearly all of which was for maintenance.  From 2006-2008, CA submitted claims totaling $22,649,399.32 under the BPA – again, nearly all of which was for maintenance.  If CA had not provided false information about its maintenance discounting practices to GSA, the Government would have been charged, and would have paid, that amount.  In short, these claims submitted by CA under the BPA were false, and as a result, the Government suffered significant damages.

**COUNT I:  Knowingly Presenting False Claims: Pricing on Government Contracts**
**(31 U.S.C. § 3729(a)(1) (2008), § 3729(a)(1)(A) (2009))**

61.     Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 60, as if fully set forth herein.  This Count is a civil action against the Defendant for violating 31 U.S.C. § 3729(a)(1) (2008) or, alternatively, 31 U.S.C. § 3729(a)(1)(A) (2009) to the extent that this provision may apply to conduct that preceded its enactment on May 20, 2009.

62.     By engaging in the conduct set forth herein, the Defendant has knowingly presented, or caused to be presented, false claims for payment to officers or employees of the United States.

63.     Because of the Defendant's conduct under this Count, the United States has suffered actual damages for claims submitted beginning in 2002, believed to be more than $100 million.

**COUNT II:  False Statements or Records: Pricing on Government Contracts**
**(31 U.S.C. § 3729(a)(2) (2008), § 3729(a)(1)(B) (2009)**

64.     Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 60, as if fully set forth herein.  This Count is a civil action against the Defendant for violating 31 U.S.C. § 3729(a)(2)(2008) or, alternatively, 31 U.S.C. § 3729(a)(1)(B)(2009) to the extent that this provision may apply to conduct that preceded its enactment on May 20, 2009.

65.     By engaging in the conduct set forth herein, the Defendant has knowingly made or used, or caused to be made or used, false records or statements for the purpose of getting false or fraudulent claims paid or approved by the Government.  The Defendant has made or used these false records or statements, or caused them to be made or used, with the specific intent to get paid by the United States.

66.     Because of the Defendant's conduct under this Count, the United States has suffered actual damages for claims submitted beginning in 2002, believed to be more than $100 million.


**PRAYER FOR RELIEF**

For each of Counts I-II of this Complaint, Plaintiff demands the following relief:

a.  That the Court enter judgment in favor of the United States and against the Defendant in an amount equal to three times the amount of damages the United States Government has sustained because of Defendant's actions, plus a civil penalty of not less than

Five Thousand Five Hundred Dollars ($5,500) and not more than Eleven Thousand Dollars ($11,000) for each violation of 31 U.S.C. § 3729;

      b.  That the Relator, as a *qui tam* Plaintiff, be awarded the maximum amount allowed pursuant to Section 3730(d) of the False Claims Act or any other applicable provision of law;

      c.  That the Relator be awarded his costs and reasonable attorneys' fees; and

      d.  That Plaintiffs have such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands that this matter be tried before a jury.

_____
Robert L. Vogel
D.C. Bar No. 414500
VOGEL, SLADE  & GOLDSTEIN, LLP
1718 Connecticut Ave., NW, Suite 700
Washington, D.C. 20009
Tel. 202-537-5904/ Fax 202-537-5905
E-mail: rvogel@vsg-law.com

/S/ Janet L. Goldstein

_____
Janet L. Goldstein
D.C. Bar No. 444861
VOGEL, SLADE  & GOLDSTEIN, LLP
1718 Connecticut Ave., NW, Suite 700
Washington, D.C. 20009
Tel. 202-537-5906/ Fax 202-537-5905
E-mail: jgoldstein@vsg-law.com

Attorneys for Plaintiff Dani Shemesh

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of April 2014, I served true copies of the foregoing

Second Amended Complaint by e-mail and by first class mail (postage prepaid) addressed to:

Ms. Beverly Russell
Assistant United States Attorney
United States Attorney's Office
555 4th Street NW
Washington, DC 20530
[E-mail: Beverly.Russell@usdoj.gov]

Mr. Patrick Klein
U.S. Department of Justice
Civil Division, Commercial Frauds Section
P.O. Box 261
Ben Franklin Station
Washington, DC 20044
[E-mail: Patrick.Klein2@usdoj.gov]

_____
Robert L. Vogel