## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| **UNITED STATES OF AMERICA EX REL. DANI SHEMESH,** |
| **Plaintiff,** |
| **v.** |
| **CA, INC.,** |
| **Defendant.** |

**Civil Action No. 09-1600 (ESH)**

## <u>MEMORANDUM OPINION</u>

Plaintiff-relator Dani Shemesh ("relator") brings this *qui tam* action under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, on behalf of the United States against defendant CA, Inc. ("CA"). Defendant now moves to dismiss relator's second amended complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). (*See* Def.'s Mem. In Supp. of Mot. to Dismiss, Jun. 16, 2014 [ECF No. 56] ("Def.'s Mem.").) For the following reasons, the motion to dismiss is granted in part and denied in part.

## BACKGROUND

Relator worked for CA Software Israel Ltd., a wholly-owned subsidiary of CA, from May 2004 until December 2008. (*See* Sec. Am. Compl., Apr. 11, 2014 [ECF No. 44] ("SAC") ¶ 8.) From September 2006 until his departure from the company, relator headed the sales division of CA Software Israel Ltd. (*See id.*) CA, incorporated in Delaware, sells computer software licenses and maintenance to federal agencies in the District of Columbia pursuant to a "Multiple Award Schedule" ("MAS") contract with the General Services Administration ("GSA"). (*See id.*

¶¶ 9, 11.)   MAS contracts allow government agencies to purchase commercial items for a pre-negotiated price and to enter into blanket purchase agreements ("BPA") with the vendor that incorporate the same terms as the MAS contract, but often include greater price discounts.  (*See id.* ¶ 11.)

CA manufactures software for large mainframe computer systems and sells these software licenses either on a term or perpetual basis to government and non-government customers.  Customers may also purchase maintenance for the software license for one or more years.  (*See id.* ¶ 19.)  CA's standard practice is to sell maintenance by calculating an associated maintenance rate for the specific software product as a percentage of the actual price paid for the software license.  (*See id.* ¶ 21.)  For example, if a customer purchases a software license for $200 and the maintenance rate is 20%, the customer would be able to purchase the maintenance for $40.  Similarly, if the customer purchases the software license for 50% of the list price of $200 and the maintenance rate is still 20%, the customer would only need to pay $20 for the maintenance.  Thus, if a customer receives a certain discount for a software license, a similar discount is applied to the maintenance fee.

CA and the GSA entered into a MAS contract, Contract No. GS-35F-0823M, on September 26, 2002.  (*See id.* ¶ 22.)  The MAS contract included terms for the sale of five types of products: 1) SIN 132-32, term software licenses; 2) SIN 132-33, perpetual software licenses; 3) SIN 132-34, maintenance; 4) SIN 132-50, training courses; and 5) SIN 132-51, information technology consulting services.[1]  (*See id.* ¶ 23.)  As required by law, CA submitted a Commercial Sales Practices Format ("CSP") form as part of the MAS contract negotiations with

---

[1] A Special Item Number ("SIN") is "a group of generically similar (but not identical) supplies or services that are intended to serve the same general purpose or function."  48 C.F.R. § 8.401.

the GSA on November 30, 2001.  S*ee* 48 C.F.R. § 515.408; (*see also* SAC ¶ 24.)  CSPs must be submitted for each SIN, but one CSP can contain more than one SIN if "the information is the same."  48 C.F.R. § 515.408(b).  The 2001 CSP attachment contained pricing information for the term software licenses, perpetual licenses, and maintenance.  (*See* Def.'s Mem. Ex. B.)  One of the CSP questions asks whether the discounts offered to the government are equal to or better than the best price offered to other customers for the same items.[2]  If a seller answers "No," it is required to provide detailed information about its discount policies and describe the circumstances under which other customers receive higher discounts than those offered to the government.  *See* 48 C.F.R. § 515.408.

In response to this question, CA answered, "No."  (Def.'s Mem. Ex. B at 2.)  CA also indicated that "[d]eviations from written policies or standard commercial sales practices disclosed . . . result in better discounts (lower prices) or concessions than indicated."  (*Id.*)  CA provided information on the CSP attachment regarding its discount policies and pricing, including explanations of its standard licenses and payment options, a description of the GSA as a "Commercial End-User" ("CEU") and proposed GSA discounts.  (*See id*. at 1, 3, 6.)  According to a chart CA provided to the government in conjunction with the 2001 CSP, CEUs made up approximately 80% of CA's sales.  (*See id.* at 1.)  CA noted that standard pricing for CEU customers was available in CA's Confidential Pricing guidelines, and discounts were subject to discretionary approval by various levels of managers depending on the size of the

---

[2] The full text of the question is as follows: "Based on written discounting policies or standard sales practices are the discounts offered to the government equal to or better than the best price (discount and concessions in any combination) offered to any customer acquiring the same items regardless of quantity or terms and conditions?  [  ] YES  [  ] NO."  (*See* Def.'s Mem. Ex. B at 2.)

discount (*see id*. at 5), and large discounts must be approved by an Executive Vice President. (*See* SAC ¶ 33.) CA also described the pricing policies for its maintenance fees on the 2001 CSP attachment.  CA stated that it "does not discount MFs [maintenance fees] . . . to the commercial end-user class of customer," but nonetheless offered the government a 2% reduction on its standard maintenance fee percentage.  (Def.'s Mem. Ex. B at 6.)  According to CA's statement on the 2001 CSP and a later September 20, 2002 letter to the GSA, "[t]he 2% reduction is a 10% (or greater) discount from the standard basis for establishing such fees."  (*See id*; *see also* SAC ¶ 58.)

CA proposed to offer the GSA its standard license for the mainframe products at a 31% discount and the remaining products at a 20% discount.  (Def.'s Mem. Ex. B at 5.)  Further, CA proposed to guarantee the "price relationship" between the government and commercial customers by applying a "most favored price guarantee" based on an average discount for the same products and maintenance sold to other CEUs for orders less than $500,000.  (*Id*.)  Thus, if the average discount for the same products sold to similar customers exceeded that promised to the GSA, CA would retroactively apply the higher, average discount to the GSA orders.  This was incorporated into the Price Reduction Monitoring Clause of the contract.  (*See, e.g.,* Def.'s Mem. Ex. C at 3.)  CA disclosed to the GSA in a June 27, 2002 letter that it would exclude certain customers from the average discount calculation based on four specific exceptions to its standard discount and pricing policies: 1) client relations; 2) competitive replacements and bids; 3) contractual rates; and 4) business metric deals.  (*See* Def.'s Mem. Ex. D at 1-2.)  In a September 20, 2002 letter to the GSA, CA increased the discount offered to the government to 35% for the software licenses, but the maintenance fee offer remained the same.  (*See* Def.'s

Mem. Ex. C at 1-2.)  The GSA accepted this offer, and the letter was incorporated into the contract.

      The initial contract between the GSA and CA became effective on September 26, 2002. (*See* Gov. Am. Compl. in Intervention, June 13, 2014 [ECF No. 55] "Gov. Am. Compl." ¶ 37.) This contract was operative for five years and was extended for one year in 2007.  (*Id*. ¶ 41.)  To facilitate the extension, CA submitted a new CSP on September 10, 2007, and offered the GSA an additional 15% discount on the software licenses for a total of 50% off the list price.  (*See id.* ¶ 50.)  The contract was extended again for another year in 2008, and CA certified in a September 4, 2008 letter that the total discount to the government for the software licenses would remain at 50%.  (*See id.* ¶ 54.)  In 2009, the parties extended the contract for three more years. (*Id*. at ¶ 55.)

      On March 31, 2006, the Department of Agriculture signed a BPA with CA based on the GSA MAS contract.  (*See* SAC ¶ 27.)  This BPA incorporates many of the basic terms and conditions of the GSA MAS contract, but includes a most-favored customer provision that states "[n]o client is provided rates more favorable than those provided to the USDA under this BPA for the same licensed products under the same use terms, conditions, volumes or restrictions." (*Id.* ¶ 27.)  Between 2006 and 2008, CA submitted $22,649,399.32 in claims under the BPA to the Department of Agriculture, most of which were for maintenance.  (*See id*. ¶ 60.)

      Relator alleges that in the process of negotiating the GSA MAS contract, CA made false statements to the government (*see id.* ¶¶ 52-58), and as a result, all claims submitted by CA pursuant to the contract, or pursuant to any BPAs formed on the basis of the MAS contract, were false.  (*See id.* ¶¶ 59-60.)  Further, relator alleges that CA's failure to disclose this information to the government pursuant to the Price Reduction Monitoring Clause resulted in additional false

statements made throughout the contract.  (*See id.* ¶ 51.)  CA was required to disclose "current, accurate, and complete" pricing policies and practices to the GSA (*see* 48 C.F.R. § 515.408, Figure 515.4 (Instructions for the Commercial Sales Practices Format)), but defendant failed to mention that sales to non-government customers often diverged from the pricelist.  (*See* SAC ¶ 29.)  In his second amended complaint, relator provides a series of examples to illustrate that, contrary to its statements to the government during contract negotiations, CA's pricing practices differed significantly from its pricelist.  Senior CA official Jose Carvalho emailed Patrick Stark, Corporate Senior Vice President of Regional Sales for Europe, Middle East, and Africa, on November 30, 2006, that "customers do not know CA's price list not even for the product they licensed. In many case (sic), the prices list is 'obscene' and we end up doing discounts around 90% without ever telling customer this." (*Id.* (quoting Carvalho Nov. 30, 2006 email).)  This sentiment was echoed in an October 2007 document titled "Mainframe Software Pricing" that was created and issued by CA's Strategic Pricing and Licensing Office.  This document noted that CA's list prices were linear, or, in other words, not related to volume and were "unrealistic." Consequently, "linear pricing required huge discounts." (*Id.* ¶ 30 (quoting the Mainframe Software Pricing document).)  According to relator, this October 2007 document also includes a chart that shows discounts worldwide, many of which exceeded 90% off the list price.  (*See id.*) Relator also describes a July 16, 2008 written communication between Starck and David Corbett in which Corbett sought approval for a non-government customer discount.  In requesting the discount, Corbett wrote, "[t]he discount at 86% is very reasonable for mainframe." (*Id.* ¶ 32.)

      In addition to citing statements by CA officials that indicate the stark disparity between CA's pricelist and its actual pricing practices, relator also points to interactions he witnessed as a CA employee.  For example, during a business meeting relator attended in Herzlia, Israel, Marci

Ginzburg, CA's Senior Vice President for Global Customer Portfolio Management, said that a proposed discount of 80-90% off the list price for software would likely be approved by corporate headquarters because such discounts were a "common practice." (*Id.* ¶ 34.) Relator personally facilitated software license and maintenance deals with large and small customers alike that received discounts greater than 50% off software list prices. (*See id.* ¶ 36.) Some of these discounts were for the same items that were sold to the U.S. government under the GSA MAS contract. (*See id.*) Personally involved with sales to customers where discounts above 80% were offered, relator recounts a company strategy to get significant discounts approved by merely telling CA officials that "the deal was 'a strategic deal.'" (*Id.* ¶ 31.) Similarly, relator witnessed CA sales of maintenance to non-government customers with lower fees. Because CA sells maintenance on its software as a percentage of the actual sales price of the software license, non-government customers receiving software licenses at a lower price than the government also receive maintenance at a lower price even if the maintenance fee is not explicitly discounted in the sales agreement.[3] (*See id.* ¶ 37.) Relator cites five specific examples of sales to Israeli customers that received far deeper discounts (up to 95.07% off list price) than those given to the GSA for the same software products and corresponding maintenance. (*Id.* ¶¶ 39-43; *see also* First Am. Compl., Aug. 19, 2010 [ECF No. 6] Ex. 1.)

---

[3] For example, if the software license is listed as $200 on the pricelist, and the government purchases the license at 50% off, the actual sale price is $100. A maintenance fee that is 18% of the license *list price* is $36. Contrastingly, a commercial customer receives 75% off the list price for the software, resulting in a sales price of $50. The maintenance fee for this customer is 20% of the *actual sales price* (*i.e.*, a higher percentage than that offered to the government), but the total comes to only $10. Thus, although the government seems to receive a higher discount on maintenance in terms of a lower percentage of the software price, the maintenance fee is actually lower for the non-government customer.

Although relator worked for CA Software Israel Ltd., a subsidiary of CA, he alleges that the list price circulated by CA is used worldwide, and CA's discount policies are globally consistent with respect to the chain of command to approve discounts.  Specifically, discounts of less than 50% may be approved by the regional sales manager; discounts between 50% and 74% must be approved by an area manager; and discounts above 74% must be approved by Allan Clayton, Senior Vice President for worldwide pricing.  (*See id.* ¶ 33.)  Nevertheless, relator also relies on internal CA documents that show CA was offering greater discounts to non-government customers in the United States.  (*See id.* ¶ 44.)  Discounts on software products and maintenance fees given to Merck, Avon, and Affiliated Computer Services, Inc. all exceeded those given to U.S. government agencies.  (*See id*. ¶¶ 45-48.)

Relator filed this action under seal on August 24, 2009, and amended his complaint on August 19, 2010.  The United States filed a complaint in intervention on March 24, 2014 (*see* Gov. Compl. in Intervention, Mar. 24, 2014 [ECF No. 42]), and at that time, the Court unsealed the case.  The government amended its complaint in intervention on June 13, 2014.  (*See* Gov. Am. Compl.)  The government intervened in both of relator's False Claims Act Counts, but narrowed the timeframe to include only false claims presented and false statements made to the government after 2006.  (*See id*. ¶¶ 67-111.)  On April 11, 2014, relator again amended his complaint.  (*See* SAC.)  In Count I, citing 31 U.S.C. § 3729(a)(1) (2008), or alternatively, 31 U.S.C. § 3729(a)(1)(A) (2009), relator alleges that defendant "knowingly presented, or caused to be presented, false claims for payment to officers or employees of the United States."  (SAC ¶¶ 61-62.)  Count II cites 31 U.S.C. § 3729(a)(2) (2008), or alternatively, 31 U.S.C. § 3729(a)(1)(B) (2009), and alleges that defendant "knowingly made or used, or caused to be made or used, false records or statements for the purpose of getting false or fraudulent claims paid or approved by

the [g]overnment." (*Id.* ¶¶ 64-65.)  Relator alleges that because of defendant's conduct under

each of these counts, "the United States has suffered actual damages for claims submitted

beginning in 2002, believed to be more than $100 million." (*Id.* ¶¶ 63, 66.)

Defendant has filed a motion to dismiss relator's second amended complaint, arguing that

1) relator failed to state a claim because he did not identify any violations of the GSA MAS

contract and to allege *scienter* and materiality; 2) relator failed to plead fraud with sufficient

particularity; and 3) some of relator's claims are barred by the statute of limitations.[4]  (*See* Def.'s

Mem. at 15.)  The Court agrees that a portion of relator's claims fall outside of the statute of

limitations, but for the reasons stated below, the Court denies the remainder of defendant's

motion to dismiss.

## ANALYSIS

## I.  STANDARD OF REVIEW

### a.  Rule 12(b)(6)

In deciding a motion to dismiss, the Court "'must accept as true all material allegations of

the complaint, and must construe the complaint in favor of the complaining party.'"  *Ord v. Dist.*

*of Columbia*, 587 F.3d 1136, 1140 (D.C. Cir. 2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 501

(1975).  In order to survive a motion to dismiss, a complaint must "plausibly give rise to an

entitlement to relief" by presenting "sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face,'" in that "the court [can] draw the reasonable inference that

the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79

(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "While legal

---

[4] Defendant has also filed a motion to dismiss the government's amended complaint in intervention.  The Court has addressed those arguments in a separate opinion that is being issued this date.

conclusions can provide the complaint's framework, they must be supported by factual allegations." *Id.* at 679.  "In determining whether a complaint fails to state a claim, [courts] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] . . . matters of which [courts] may take judicial notice," *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997), and documents "appended to [a] motion to dismiss and whose authenticity is not disputed" if they are "referred to in the complaint and are integral" to a relator's claim.  *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).

### b.  Rule 9(b)

Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  To satisfy these requirements, the party "'must state the time, place and content of the false misrepresentations, the fact misrepresented and what was [ob]tained or given up as a consequence of the fraud.'"  *Kowal v. MCI Commc'ns, Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994) (quoting *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981)). The purpose of Rule 9(b) is to ensure that the complaint "is specific enough to allow [defendants] to prepare [their] defense," *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F.Supp.2d 258, 267 (D.D.C. 2002) ("*Pogue I*"), to "discourage the initiation of suits brought solely for their nuisance value, and [to] safeguard[ ] potential defendants from frivolous accusations of moral turpitude."  *Cannon*, 642 F.2d at 1385.

## II.     RELATOR'S CLAIMS

Relator brings two claims against CA under the False Claims Act: 1) CA knowingly presented false claims to the government (*see* 31 U.S.C. § 3729(a)(1) (2008)); and 2) CA knowingly made false statements material to a false claim to the government. (*See* 31 U.S.C. § 3729(a)(2) (2008)). Relator's claims are primarily based on conduct that occurred before the May 20, 2009 enactment of the Fraud Enforcement and Recovery Act ("FERA"), which included significant amendments to the FCA. In the text of FERA, Congress provided that "[t]he amendments made by this section shall take effect on the date of enactment of this Act and shall apply to conduct on or after the date of enactment. . . ." subject to two exceptions that are not applicable to relator's claims. Pub. L. No. 111-21, § 4(f), 123 Stat. 1617, 1625 (2009). Because the modifications to the FCA statute do not affect relator's claims[5] (*see* 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B)), unless indicated otherwise, the Court will cite to the FCA as it existed prior to the enactment of the FERA amendments.

The Court must first consider whether relator has adequately pled his claims as required by Rule 12(b)(6) before turning to defendant's argument that relator has failed to plead the circumstances of the fraud with sufficient particularity.

---

[5] The FERA amendments to the FCA added "material" to the false statement provision, making explicit what courts had already been reading into the statute. *See* 31 U.S.C. § 3729(a)(1)(B); *see also United States ex rel. Ervin and Assocs., Inc. v. Hamilton Sec. Group, Inc.*, 370 F.Supp.2d 18, 36 (D.D.C. 2005) ("The great weight of case law holds that the materiality of a false record or statement is an element of False Claims Act liability."); *United States v. TDC Mgmt. Corp.*, 24 F.3d 292, 298 (D.C. Cir. 1994) (holding that to prevail under the FCA, the government must prove the alleged false information was material). Congress declined to make a similar addition to the presentment prong of the FCA. *See* 31 U.S.C. § 3729(a)(1)(A). To the extent that materiality was required as an element of presentment prior to the FERA amendments, the relator has satisfied this requirement by alleging that CA's claims for payment, pursuant to a fraudulently induced contract, led the government to make significant overpayments. (*See* SAC ¶ 59.)

### a.  Sufficiency of Relator's Claims under 12(b)(6)

The False Claims Act provides liability for "any person who (1) knowingly presents or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval; [or] (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a) (2008).  For an FCA claim to be actionable, relator must also allege materiality.  "[T]here must be a claim 'for payment or approval,' and '[a]s a result, only (i) actions which have the purpose and effect of causing the government to pay out money where it is not due, or (ii) actions which intentionally deprive the government of money it is lawfully owed, are considered claims within the meaning of the FCA.'" *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 297 F.Supp.2d 272, 278 (D.D.C. 2004) (quoting *United States ex rel. Windsor v. DynCorp, Inc.*, 895 F.Supp. 844, 850 (E.D.Va. 1995)).  A "claim" includes "any request or demand, whether under a contract or otherwise, for money or property . . . if the United States Government provides any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(c) (2008).  Defendant does not contest that it submitted claims for payment to the government pursuant to its contract with the GSA; however, defendant denies that these claims were false and that it made any false statements to the government.  Further, CA argues that relator has failed to allege any instances in which defendant knowingly violated a contractual or regulatory obligation.

### 1.  Falsity

Under the MAS contract regulations, contractors are not required to offer the government a best-price guarantee.  "The Government will seek to obtain the offeror's best price. . . . However, the Government recognizes that . . . there may be legitimate reasons why the best price

is not achieved." 48 C.F.R. § 538.270(a).  The government contracting officer must evaluate

offers based on volume, the contractor's standard prices and discounts, length of the contract

period, warranties, and other relevant information.  *See* 48 C.F.R. § 538.270(c).  If the offer does

not ensure the best price to the government, the contracting officer may award the contract

notwithstanding so long as the prices offered to the government are "fair and reasonable" and the

award is otherwise in the best interest of the government.  48 C.F.R. § 538.270(d).  Before

awarding the contract, the contracting officer and the contractor must agree on the category of

customer that will be the basis for the award and the government's price or discount relationship

to the identified customer.  *See* 48 C.F.R. § 552.238–75(a).  During the contract period, the

contractor is required to report to the contracting officer all price reductions to the customer or

category of customers that served as the basis of the award and provide an explanation of the

conditions that led to such reductions.   *See* 48 C.F.R. § 538.272(a); *see also* 48 C.F.R. §

552.238–75(b).  The contractor must apply a price reduction under the MAS contract if the

discount arrangement applicable to the identified commercial customer "results in a less

advantageous relationship between the eligible ordering activities [of the government] and this

customer or category of customers."  48 C.F.R. § 538.272(a).  Thus, under MAS contract

regulations, CA was required to provide the government with current and accurate pricing

information so that the contracting officer could make an informed determination of whether the

offered prices were fair and reasonable and to report to the government any price reductions

afforded to the category of customers that was used as the basis for the award.  The category of

customer that formed the basis of the GSA MAS contract was CEUs with fixed commitments of

$500,000 or less, excluding a limited number of enumerated exceptions.  (*See* Def.'s Mem. Ex. C

at 3.)  Thus, during the existence of the contract, CA had the duty to disclose its pricing practices truthfully and completely under both the contract and the governing regulatory scheme.

Defendant repeatedly argues that relator's interpretation of the MAS contract is incorrect and that relator has failed to identify actual contract violations, much less falsity of a claim.  (*See* Def.'s Mem. at 7-13.)  At this stage, the Court must accept the SAC's well-pleaded facts as true, and under relator's theory of the case, defendant's persistent focus on contract interpretation is misplaced and misapprehends the gravamen of relator's complaint.  In particular, CA argues that relator incorrectly interprets the MAS contract to include a best-price guarantee, despite CA's explicit disclosure to the government that it was not offering "most favored customer" pricing. (*See* Def.'s Mem. at 8.)  This misstates relator's argument.  Rather than alleging that CA violated a contractual or regulatory duty to provide the government with its best price, relator posits that "CA was required to disclose to the United States the discounts available to certain categories of customers, CA did not do so, which resulted in federal Government purchasers paying substantially higher prices than other similarly situated non-Government customers who purchased the same items."  (SAC Intro.)  Relator noted that the MAS contract regulations allow contracting officers to award contracts containing less favorable pricing so long as they are determined to be fair and reasonable and otherwise in the best interest of the government.  (*See* SAC ¶¶ 13-14.)  Including several examples of the government paying higher prices for the same products sold to non-government customers, relator claims that CA provided the government with an inaccurate average discount.  (*See* SAC ¶ 50.)  The issues raised by relator are not rooted in contract interpretation, but rather, they are factual disputes regarding what CA did or did not disclose to the government during the course of the MAS contract negotiations and the subsequent contract period.

In effect, relator alleges that CA induced the government to enter into the contract under fraudulent circumstances, and all subsequent claims based on this contract were false.  (*See* SAC ¶ 59.)  Allegations that a defendant fraudulently induced the government to enter into a contract provide "sufficient grounds for a False Claims Act claim to survive a Rule 12(b)(6) motion." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 791 (4th Cir. 1999); *see also United States ex rel. Head v. Kane Co.*, 798 F.Supp.2d 186, 196 (D.D.C. 2011) ("Fraudulent inducement claims consist of 'claim[s] submitted to the Government under a contract which was procured by fraud, even in the absence of evidence that the claims were fraudulent in themselves.'" (quoting *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005))).

Similar circumstances were at issue in *United States ex rel. Frascella v. Oracle Corp.*, 751 F.Supp.2d 842 (E.D. Va. 2010).  In *Frascella*, Oracle made a series of allegedly inaccurate pricing disclosures to the GSA beginning in 1997 during the negotiation of a MAS contract for computer software.  *See id.* at 845.  Relator filed a complaint in 2007 alleging that Oracle had fraudulently induced the GSA to enter into the MAS contract in 1998 by making false statements regarding pricing and discounting for Oracle's software licenses, and the United States intervened.  *See id.* at 846.  The court held that the false statements Oracle made during performance of the contract and renegotiation of the contract that the pricing policies originally provided in 1997 "were made with the intent to induce GSA to enter into contract modifications and to continue to accept the discounts originally disclosed.  Such allegations are sufficiently detailed and plausible to state a claim to relief under . . . the False Claims Act."  *Id.* at 855 (citing

*Westinghouse Savannah River Co.*, 176 F.3d at 791; *United States ex rel. Ubl v. IIF Data Solutions*, No. 06-cv-0641, 2007 WL 2220586, at *3-4 (E.D.Va. Aug. 1, 2007)). [6]

Likewise, relator alleged that CA made misrepresentations to the government in its 2001 CSP and the 2002 letter to the government, and subsequent to the award of the contract, CA failed to disclose "to the Government the true nature of its pricing and discounting practices with respect to comparably situated non-Government customers."  (SAC ¶16.)  CA was required to provide current and accurate information regarding its pricing policies in its disclosures (*see* 48 C.F.R. § 515.408), but the pricelist attached to the 2001 CSP was often disregarded by CA officials during the sales process with non-government customers.  (*See, e.g.,* SAC ¶¶ 29-31.)  In addition, relator asserts that CA inaccurately disclosed its maintenance fee pricing policies on the 2001 CSP.  Under the heading, "End-User Discounting & Pricing Practices," CA stated that it did not discount maintenance fees to commercial end-user customers.  (Def.'s Mem. Ex. B at 6.)  CA offered the government a 2% reduction on its standard maintenance fee percentage and confirmed that "[t]he 2% reduction is a 10% (or greater) discount from the standard basis for establishing such fees."  (*Id.*)  This offer was repeated in the September 20, 2002 letter to the GSA.  (*See* SAC ¶ 58.)  Citing several examples in which CA discounted maintenance fees for several customers, relator contends that these declarations were untruthful, and the normal pricing policy for maintenance fees was to calculate them as a percentage of the actual price paid

---

[6] CA argues that *Frascella* is inapplicable because "[t]he defendant in *Frascella* did not argue materiality as a ground for dismissal, and the court did not address the materiality element in its opinion."  (Def.'s Mem. at 17.)  This attempt to distinguish *Frascella* is unpersuasive.  The *Frascella* opinion is instructive on how facts that are similar to those in this case have been held to constitute fraud in the inducement thereby satisfying the falsity element of FCA claims.  Whether the defendant put materiality at issue does not have a bearing on the falsity of the claims or statements because materiality is distinct from falsity.

for the discounted software license, which would often discount the maintenance list price by more than the discount offered to the government.  (*See* SAC ¶¶ 39-43, 54-56.)

CA attempts to rebut this allegation by relying on the distinction between maintenance sold as part of a bundle with a license and maintenance as a stand-alone order.  (*See* Def.'s Mem. at 21.)  Depending on the offered pay option, maintenance is either included in the total price or is available for purchase separately.  (*See* Def.'s Mem. Ex. B at 3.)  The P0 pay option is the only pay option CA disclosed to the government that does not include maintenance in the total price, so any maintenance purchased along with a P0 license would be a separate transaction, or "unbundled."  The remaining pay options offer a variation of the following: the license and maintenance are purchased for a specified period of time, after which, if the customer would like to continue using the license, a fee is applied and maintenance is "subject to payment of the then-prevailing annual [maintenance fee]."  (*Id.*)  CA argues that in describing its pay options, it fully disclosed that maintenance fees bundled with licensed products are discounted, and to state a claim, relator needed to allege that CA discounted stand-alone maintenance.[7]  (*See* Def.'s Mem. at 21.)  However, the reasonableness of CA's contention cannot be determined by the Court based on the limited record available at this time.  Relator alleges that CA misinformed the government about its standard maintenance fee practices, violating its obligation to submit current, complete, and accurate pricing information to the government.  (*See* SAC ¶ 50.)  Whether CA disclosed to the government the intricacies of when maintenance is sold alone, how maintenance fees are calculated after the term for the non-P0 pay-option licenses has expired,

---

[7] In fact, relator did allege that CA discounted stand-alone maintenance.  In his second amended complaint, relator describes two sales of maintenance to customers that were purchased as additional maintenance beyond the term of the original pay option.  (*See* SAC ¶¶ 47-48.)  Thus, even if relator were required to allege as defendant argues, he did so.

and which pay options government agencies purchased are factual questions that cannot be resolved at the motion to dismiss stage.

Further, CA focuses on two statements that relator has alleged are false, but relator's allegations do not rest on merely one or two specific misrepresentations by CA to the government in 2001 and 2002. On the contrary, the misrepresentations in 2001 and 2002 form the factual background from which other false statements occurred during the course of the contract. Although relator identifies two false statements regarding the maintenance fee on the 2001 CSP and the 2002 letter, relator's allegations are that CA misrepresented its pricing policies in a number of ways, including failing to notify the government during the course of the contract that the average discount offered to non-government customers was much higher than previously disclosed. (*See* SAC ¶ 51; *see also* Gov. Am. Compl. ¶ 48.)

The *Frascella* opinion is instructive on this issue as well. In its motion to dismiss, Oracle argued that any FCA claims based on the 1997 disclosure were barred by the statute of limitations, and the court agreed. *See Frascella*, 751 F.Supp.2d at 854. However, because the court held that "when read as a whole, the United States' Complaint in Intervention allege[d] an ongoing, interrelated fraud involving multiple false statements and omissions during the performance of the Oracle contract, leading to the submission and payment of a number of false claims," it declined to dismiss the rest of the complaint. *Id.* at 855. As was the case with Oracle, during the contract period CA was under an obligation to comply with the Price Reduction Monitoring Clause. (*See* Def.'s Mem. Ex. C at 3.) Relator alleges that CA failed to comply with this obligation, and as a result, the government was not able to obtain a price reduction so as to maintain the static relationship between the government pricing and the category of customer that formed the basis of the award. (*See* SAC ¶ 51.) Relator further alleges that "CA's improper

concealment of pricing and discounting information that CA was legally required to disclose to the Government" resulted in "[g]overnment customers [paying] at least one hundred million dollars of overpayments to CA."  (SAC ¶ 59.)

By way of example, relator cites the BPA negotiated with CA by the Department of Agriculture in 2006.  (*See id.* ¶ 60.)  CA and the Department of Agriculture formed the BPA contract by adopting some of the GSA MAS contract terms, but it negotiated further discounts. (*See id.*)  For example, the BPA included a best-price guarantee provision which states that "[n]o client is provided rates more favorable than those provided to the USDA under this BPA for the same licensed products under the same use terms, conditions, volumes or restrictions."  (*Id.* ¶ 27.)  Between 2006 and 2008, CA submitted $22,649,399.32 in claims to the Department for payment under the BPA.  Because the GSA MAS contract prices served as the basis for negotiating the BPA, these claims submitted to the government were false and resulted in significant overpayments.  (*See id.* ¶ 60.)  The alleged facts, taken as true, indicate that CA made false statements and submitted false claims to the government throughout the BPA contract period.

## 2.  Defendant's knowledge

Relator must allege that defendant knew that the claims presented and the statements made to the government were false.  "A person acts knowingly if he acts with 'actual knowledge, deliberate ignorance or reckless disregard of the truth or falsity of information.'  Because Rule 9(b) permits knowledge to be pled generally, there is no basis for dismissal for failure to plead knowledge with particularity." *United States ex rel. Westrick v. Second Chance Body Armor, Inc.,* 685 F.Supp.2d 129, 139 (D.D.C. 2010) (quoting 31 U.S.C. § 3729(b)) (internal citation

omitted); *see also* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a

person's mind may be alleged generally.").

      Defendant relies on *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257

(D.C. Cir. 2010) ("*SAIC II*"), for the proposition that relator's SAC fails to state a claim because

it neglects "to connect a single individual to any alleged fraud, or provide a single fact from

which the court could infer that an individual had the requisite knowledge."  (Def.'s Mem. at 23.)

In *SAIC II*, the D.C. Circuit analyzed whether the district court's "collective knowledge"

instruction to the jury was erroneous and prejudicial.  The Court concluded that "under the FCA,

'collective knowledge' provides an inappropriate basis for proof of scienter because it effectively

imposes liability, complete with treble damages and substantial civil penalties, for a type of loose

constructive knowledge that is inconsistent with the Act's language, structure, and purpose."

*SAIC II*, 626 F.3d at 1274.  As further noted by the DC Circuit, "the 'collective knowledge'

theory allows 'a plaintiff to prove scienter by piecing together scraps of "innocent" knowledge

held by various corporate officials, even if those officials never had contact with each other or

knew what others were doing in connection with a claim seeking government funds.'"  *Id.* at

1275 (quoting *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908,

918 n.9 (4th Cir. 2003)).

      As defendant points out, relator has failed to identify a specific employee who knew he or

she was submitting a false claim for payment or was making a false statement to the government.

However, this shortcoming is not fatal at this stage.  *SAIC II* involved defective jury instructions

following a trial at which the plaintiff was required to prove each element of its FCA claim.  By

contrast, during the motion to dismiss stage, relator must only allege facts accepted as true from

which "the court [can] draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Iqbal*, 556 U.S. at 678.  Based on the facts relator has alleged, the Court is able to draw such an inference.  Relator described the management structure CA adopted for approving varying levels of discounts.  (*See* SAC ¶ 33.)  He noted that all discounts higher than 74% offered anywhere in the world must be approved by Allan Clayton, Senior Vice President for world-wide pricing.  (*See id*.)  Relator has also included several instances of senior officials stating that CA's pricelist requires substantial discounts.  (*See id*. ¶¶ 29 (Jose Carvalho emails in November 2006 that "the price list is 'obscene' and we end up doing discounts around 90%"), 30 (Mainframe Software Pricing document circulated by CA's Strategic Pricing and Licensing Office in October 2007 described the pricelist as "linear" requiring "huge discounts"), 32 (David Corbett emails in July 2008 seeking approval of an 86% discount, which he describes as "very reasonable for mainframe"), 34 (Marci Ginzburg says in a meeting relator attended that discounts above 80-90% were a "common practice").)

Relator describes in detail CA's standard pricing policy for software licenses and maintenance sold to its non-government commercial customers.  He alleges that this policy is not what was disclosed to the government during the negotiation process that ultimately led to the MAS contract.  (*See* SAC ¶ 50.)  The discounts incorporated into the contract are not nearly as generous as those provided to non-government customers.  Relator includes several examples comparing the prices given to non-government customers to those given to the GSA for similar orders.  (*See* SAC ¶¶ 39-43.)  The pricelist and disclosed maintenance fees, according to relator, are inaccurate representations of CA's pricing practices.  Relator alleges that CA had a continuing duty throughout the contract period to correct these inaccuracies but failed to do so. (*See* SAC ¶ 51.)  CA was required to disclose "current, accurate, and complete" pricing policies and practices to the GSA on all CSP forms and to inform the government over the course of the

contract if these pricing policies no longer reflected the average discount to non-government CEU customers. (*See* 48 C.F.R. § 515.408; *see also* 48 C.F.R. § 538.272(a)). Had these disclosures been made, the government could have, at a minimum, triggered the Price Reduction Monitoring Clause, lowered the prices charged, and demanded refunds of overcharges.

Taken together, the statements by high-ranking CA officials and the description of company practices provide a sufficient foundation for the Court to reasonably infer that CA employees knew that the pricelist was not a current and accurate representation of CA's pricing practices and that all claims submitted pursuant to the MAS contract were false.

### 3. Materiality

Defendant argues that the false statements relator highlights were not material to the government's decision to pay CA for the submitted claims. (*See* Def.'s Mem. at 24.) "To state a claim under the FCA, a complaint must allege that the false or fraudulent statements were material." *Head*, 798 F.Supp.2d at 199 (citing *Bender v. N. Am. Telecomm'ns, Inc.*, 686 F.Supp.2d 46, 49 (D.D.C. 2010)). "A false statement is material if it 'has a natural tendency to influence agency action or is capable of influencing agency action.'" *United States ex rel. Fago v. M & T Mortg. Corp.*, 518 F.Supp.2d 108, 118 (D.D.C. 2007) (quoting *United States ex rel. Berge v. Bd. of Trs. of the Univ. of Ala.*, 104 F.3d 1453, 1460 (4th Cir. 1997)). The government requires all MAS contractors to publish a pricelist that "contains the pricing and the terms and conditions pertaining to each Special Item Number." 48 C.F.R. § 8.402(b). The pricelist for the licensed products and maintenance provided the basis for calculating the discount incorporated into the contract. Indeed, CA offered the government 35% off of the pricelist in 2002 rather than specifying a monetary amount. (*See* Def.'s Mem. Ex. C at 1.) Considering that the pricelist was the basis for the negotiated price, defendant's argument that misrepresenting CA's pricelist is

immaterial to the government's decision to pay a certain contract price is puzzling at best.  The MAS contract regulations clarify that the disclosed pricelist is paramount to the decision to enter into the contract.  Offerors are required to disclose "current, accurate, and complete" pricing information so that the contracting officer can evaluate the offer based on volume, the contractor's standard prices and discounts, and other contributing factors.  *See* 48 C.F.R. § 515.408; *see also* 48 C.F.R. § 538.270(c).  If the offered price is not the best price possible, the contracting officer must determine whether the offered price is fair and reasonable and in the best interest of the government.  *See* 48 C.F.R. § 538.270(d).  These decisions are hindered if the offeror does not provide an accurate pricelist.  Consequently, any false statements regarding the continuing validity of the pricelist CA provided during contract negotiations are material to the government's decision to enter into the contract and subsequent decision to pay claims submitted during the contract period.

In support of its argument that any misrepresentations of its pricelist were immaterial, CA points to the Price Reduction Monitoring Clause in the contract that "provided a mechanism for government customers to receive average standard discounts – through a process wholly independent of the CSP disclosures."  (Def.'s Mem. at 25.)  The Price Reduction Monitoring Clause provides:

> On a quarterly basis, within 30 days at the end of each fiscal quarter, March, June, September and December, CA agrees to review the net aggregate discounts for each pay option, including competitive bids, for any firm fixed commitment of $500K or less and outside the discount exceptions discussed below. . . . In those instances where the Commercial End User aggregate discount exceeds the discount in Computer Associates GSA Schedule, within 15 days of discovery, Computer Associates will pass on the difference to the GSA Schedule, thereby, maintaining the discount relationship on a going forward basis.

(Def.'s Mem. Ex. C at 3-4.)  This provision allows the government to obtain a rebate consisting of the difference between what it previously paid CA for a submitted claim and the average

discount given to similarly situated CEUs during the preceding quarter.  In theory, this clause could prevent any overpayment on claims due to misrepresentations of the pricelist, but in practice, the Price Reduction Monitoring Clause was wholly ineffective.  At least until 2006, CA failed to file these reports, and thereafter, it failed to report that the average discount for the relevant category of commercial customers was higher than what it was giving to the government.  In turn, this caused the government to pay inflated prices and to forgo any refunds. (*See* Gov. Am. Compl. ¶¶ 48, 114-17; *see also* SAC ¶ 51.)  Therefore, the relator has adequately alleged materiality.

### b.  Particularity of the circumstances constituting fraud

In setting forth these allegations, relator identified with particularity the false statements, how the false statements were made, when they were made, and numerous examples contrasting these false statements with CA's normal pricing practices.  Relator did not, however, identify a specific employee responsible for communicating these false statements or presenting the false claims to the government.  As with the Rule 12(b)(6) analysis above, this is not fatal at this stage in light of the circumstances described by relator.

"[T]he Court acknowledges that some cases have required greater specificity in allegations of fraud tha[n] [r]elator's complaint provides," but "Rule 9(b) is analyzed case by case."  *Pogue I*, 238 F.Supp.2d at 269-70; *see also In re Orion Sec. Litig.*, No. 08-cv-1328, 2009 WL 2601952, at *1 (S.D.N.Y. Aug. 20, 2009) ("[I]n order to determine whether the particularity requirements of Rule 9(b) apply in a given case, courts must undertake a 'case-by-case analysis of particular pleadings.'") (quoting *In re Refco, Inc. Sec. Litig.*, 503 F.Supp.2d 611, 632 (S.D.N.Y. 2007)).  "To say that fraud has been *pleaded* with particularity is not to say that it has been *proved* (nor is proof part of the pleading requirement).  [Relator's] complaint may be

24

wrong," *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 855 (7th Cir. 2009), but defendants have been given enough information "to defend against the charge and not just deny that they have done anything wrong." *United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1259 (D.C. Cir. 2004) (internal quotation marks omitted). "Rule 9(b) does not require plaintiffs to allege every fact pertaining to every instance of fraud when a scheme spans several years." *Id*. Indeed, plaintiffs are not required "to specifically name which employees of a corporate defendant submitted the false claims." *Head*, 798 F.Supp.2d at 203 (citing *Westrick*, 685 F.Supp.2d at 139). Further, "[i]n cases where the complaint alleges complex or extensive fraud schemes, courts often relax the Rule 9(b) standard." *Bender*, 686 F.Supp.2d at 52 (citing *United States ex rel. Harris v. Bernad*, 275 F.Supp.2d 1, 8 (D.D.C. 2003)); *see also Head*, 798 F.Supp.2d at 203.

The scheme by which CA concealed its pricing practices from the government is just such a scheme; it spanned several years with multiple re-certifications of the same false statements every time that CA was required, but failed, to inform the government that the MAS contract pricing did not reflect the average discount offered to non-government CEUs. Relator alleged that over the course of eight years, between the initiation of the GSA contract and relator's initial complaint, CA misrepresented to the government its pricing practices for licensed software and maintenance by signing off on inaccurate CSPs and disguising its true pricing and discounting practices with respect to non-government CEUs. CA has submitted false claims throughout this period and negotiated at least one BPA involving the Department of Agriculture based on the GSA prices that were tabulated using false and incomplete data. Therefore, the Court is satisfied that at this stage relator has provided sufficient particularity to comply with

Rule 9(b) without identifying the specific individuals who were responsible for making false

statements and presenting false claims to the government.

## III.   STATUTE OF LIMITATIONS

Relator's claims are subject to the FCA's statute of limitations which provides that "[a]

civil action under section 3730 may not be brought (1) more than 6 years after the date on which

the violation of section 3729 is committed, or (2) more than 3 years after the date when facts

material to the right of action are known or reasonably should have been known by the official of

the United States charged with the responsibility to act in the circumstances, but in no event

more than 10 years after the date on which the violation is committed, whichever occurs last."

31 U.S.C. § 3731(b).

The parties disagree on the application of the FCA statute of limitations.  The tolling

provision of § 3731(b)(2) extends the standard six-year statute of limitations to up to ten years

after the right of action accrues.  Relator urges the Court to apply the holding in *Pogue II* that the

tolling provision applies to both relators and the United States.  *United States ex rel. Pogue v.*

*Diabetes Treatment Ctrs. of Am., Inc.*, 474 F.Supp.2d 75, 85 (D.D.C. 2007) ("*Pogue II*").

However, the Court will follow the majority view that the tolling provision of 31 U.S.C. §

3731(b)(2) does not apply to *qui tam* relators.  *See United States ex rel. Sanders v. N. Am. Bus*

*Indus., Inc.*, 546 F.3d 288, 293 (4th Cir. 2008) (holding that § 3731(b)(2) "extends the FCA's

statute of limitations beyond six years only in cases in which the United States is a party" and

observing that this interpretation "is decidedly the majority approach in the federal courts of

appeals."  *Id*. at 296.); *see also United States ex rel. Landis v. Tailwind Sports Corp.*, No. 10-cv-

976, 2014 WL 2772907, at *14 (D.D.C. June 19, 2014) ("the statute's express language

demonstrates that Congress did not intend to apply the tolling provisions to relators."); *United*

*States ex rel. Fisher v. Network Software Assocs., Inc.*, 180 F.Supp.2d 192, 194 (D.D.C. 2002)

("The statutory language and legislative history support the conclusion that Section 3731(b)(2)

. . . applies only to the government and not to a *qui tam* relator."); *United States ex rel. El Amin*

*v. George Washington Univ.*, 26 F.Supp.2d 162, 172 (D.D.C. 1998) ("The plain language of the

statute implies that 31 U.S.C. § 3731(b)(2) only applies to an action in which the government

decides to intervene.").

Relator argues that even if the six-year statute of limitations period applies, his claims are

not time-barred because the Wartime Suspension of Limitations Act ("WSLA") has tolled the

limitations period.  In relevant part, the WSLA provides:

> When the United States is at war or Congress has enacted a specific authorization
> for the use of the Armed Forces, as described in section 5(b) of the War Powers
> Resolution (50 U.S.C. 1544(b)), the running of any statute of limitations applicable
> to any offense (1) involving fraud or attempted fraud against the united States or
> any agency thereof . . . , or (2) committed in connection with the acquisition, care,
> handling, custody, or control or disposition of any real or personal property of the
> United States, or (3) committed in connection with the negotiation, procurement,
> award, performance, payment for, . . . , of any contract, subcontract, or purchase
> order which is connected with or related to the prosecution of the war . . . , shall be
> suspended until 5 years after the termination of hostilities as proclaimed by a
> Presidential proclamation, with notice to Congress, or by a concurrent resolution of
> Congress.

18 U.S.C. § 3287.

Defendant responds that the WSLA does not apply to relator's claims because 1) the

WSLA applies only to criminal offenses, not civil actions, 2) the government has not joined in

the pre-2006 claims, and 3) relator's claims are not related to any war effort.  (Def.'s Mem. at 32

n.16.)  Courts have resolved these questions in conflicting ways.  *See, e.g., United States v. Wells*

*Fargo Bank, N.A.*, 972 F.Supp.2d 593 (S.D.N.Y. 2013) (the WSLA applies to government FCA

claim related to domestic mortgage loan practices); *United States v. BNP Paribas SA*, 884

F.Supp.2d 589 (S.D. Tex. 2012) (the WSLA 2008 amendments that allowed "military action" to

trigger the WSLA instead of a formal declaration of war applied retroactively to the

government's civil claims); *United States v. Western Titanium, Inc.*, No. 08-cr-4229, 2010 WL

2650224, at *5-6 (S.D. Cal., July 1, 2010) (military actions in Iraq and Afghanistan do not satisfy

the pre-2008 WSLA requirement that the United States must be "at war"); *United States ex rel.

Landis*, 2014 WL 2772907, at *27 (the WSLA does not apply to civil FCA suits).

      The Fourth Circuit recently held that the WSLA applies to *qui tam* civil actions brought

under the FCA.  *See United States ex rel. Carter v. Halliburton Co.*, 710 F.3d 171, 177-81 (4th

Cir. 2013) *cert. granted*, *Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 134

S.Ct. 2899 (2014).  In *Carter*, the court relied on the analysis in *Dugan & McNamara, Inc. v.

United States*, 127 F.Supp. 801, 802 (Ct. Cl. 1955), which looked to the legislative history of the

WSLA to conclude that the removal of the phrase "now indictable" from previous iterations of

the Act pointed to a legislative intent to broaden the scope of the WSLA to include civil actions.

*Carter*, 710 F.3d at 179.  The Fourth Circuit, the only circuit to consider the applicability of the

WSLA to FCA claims, also held that the WSLA applies to relators bringing civil suits because

"whether the suit is brought by the United States is irrelevant to this case because the suspension

of limitations in the WSLA depends upon whether the country is at war and not who brings the

case."  *Id*. at 181.  Although some district courts have applied *Carter's* holding (*see United

States ex rel. Carroll v. Planned Parenthood Gulf Coast, Inc.*, 21 F.Supp.3d 825, 837 (S.D. Tex.

2014); *United States ex rel. Paulos v. Stryker Corp.*, No. 11-cv-0041, 2013 WL 2666346, at *15

(W.D. Mo. June 12, 2013); *but see United States ex rel. Emanuele v. Medicor Assocs.*, No. 10-

cv-0245, 2013 WL 3893323, at *7 (W.D. Pa. July 26, 2013) ("[A]fter careful consideration of

both the majority and dissenting opinions in *Carter*, we conclude that the legislative history and

Congressional intent behind both the WSLA and the FCA caution against application of the

WSLA's tolling provisions to private FCA claims."), the only case in this jurisdiction that has examined *Carter* has distinguished its holding.  *See Landis*, 2014 WL 2772907, at *27 n.27 (holding that the proof of fraud standards for the WSLA and the FCA are irreconcilable, the court noted that the Fourth Circuit did not discuss this issue, so "[t]he relator's heavy reliance on [*Carter*] is therefore misplaced.").

Certiorari was granted in *Carter* on July 1, 2014, calling into question the Fourth Circuit decision.  *See Kellogg Brown & Root Servs., Inc.*, 134 S.Ct. 2899.  Although the Supreme Court's holding could well address two of CA's arguments against applying the WSLA in this case, there is at least one critical question not before the Court.  In *Carter*, the defendant falsely billed the government for services provided to the United States military serving in Iraq.  *See Carter*, 710 F.3d at 174.  The underlying transactions were directly related to the war effort in Iraq, an important fact that is not present in the case at hand.  Applying the WSLA to a *qui tam* civil action unrelated to the war effort would expand the WSLA far beyond its current applications,[8] which the Court is unwilling to do.  Accordingly, the Court concludes that false claims presented and false statements made to the government before August 24, 2003, are time barred.

---

[8] The Southern District of New York held that the WSLA does not apply exclusively to fraudulent conduct related to the war.  *See Wells Fargo Bank, N.A.*, 972 F.Supp.2d at 613. Employing the "grammatical rule of the last antecedent," the court decided that the limiting clause of the third prong of the WSLA ("which is connected with or related to the prosecution of the war") only modifies that prong.  Thus, "applying the WSLA to all frauds against the United States, including those unrelated to the war, accords with the purpose of the Act."  *Id*.  However, the plaintiff in that case was the United States, not a relator, so its holding does not resolve the instant case.

## IV.     RELATOR ADOPTS GOVERNMENT'S COMPLAINT IN INTERVENTION

In his SAC, relator adopts the complaint in intervention filed by the United States and incorporates all of the allegations therein.  (*See* SAC ¶ 1-2.)  Defendant argues that relator does not have standing to prosecute the claims brought by the United States because "[o]nce the Government intervenes, its Complaint in Intervention is the operative pleading" and "any duplicative claims filed by the Relator must be stricken or dismissed with prejudice."  (Def.'s Mem. at 33.)  Contrary to defendant's argument, the text of the FCA clarifies that relators continue to have standing following the government's intervention.  The FCA states that "[i]f the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action.  *Such person shall have the right to continue as a party to the action.*"  31 U.S.C. § 3730(c)(1) (emphasis added).  Defendant is correct that courts can dismiss relator's substantially similar claims, but dismissal is not automatically triggered by the government's intervention.  *See Landis*, 2014 WL 2772907, at *8 ("[T]here is no presumption under the statute against allowing both complaints to proceed.").  Instead, the FCA provides that "[u]pon a showing by the defendant that unrestricted participation during the course of the litigation by the person initiating the action would be for purposes of harassment or would cause the defendant undue burden or unnecessary expense, the court may limit the participation by the person in the litigation."  31 U.S.C. § 3730(c)(2)(D).

In *United States ex rel. Raggio v. Jacintoport Int'l LLC*, a case on which CA relies, the defendant explicitly told the court that defending against two duplicative complaints would compel it to litigate redundant issues.  Acknowledging that relator's amended complaint was identical to that filed by the government, the court held that the similarity in the two complaints caused defendant an "undue burden or unnecessary expense."  *See United States ex rel. Raggio v.*

30

*Jacintoport Int'l LLC*, No. 10-cv-1908, 2013 WL 2462109, at *2 (D.D.C. June 7, 2013).  Most of

relator's allegations are not substantially similar to those set forth by the government in its

amended complaint in intervention.  (*See* Gov. Am. Compl.)  The government's FCA claims

focus on a later period of time, and the amended complaint in intervention includes additional

breach of contract claims.  (*See id.* ¶¶ 140-47.)  Relator's adoption of the government's

allegations incorporate claims into his complaint that duplicate the government's claims, but the

Court is not required to dismiss them on these grounds alone.  Defendant has not made a

showing that defending against the claims brought by both the relator and the government would

cause an undue burden or unnecessary expense.  Indeed, defendant attempts to persuade the

Court that dismissal of identical claims is automatic rather than supplying details of the expense

and burden it must undertake to defend against the relator in addition to the government.

Without such a showing, the Court declines to dismiss relator's claims adopted from the

government's complaint in intervention.  *See United States ex rel. Sansbury v. LB & B Assocs.,

Inc.*, No. 07-cv-0251, 2014 WL 3509789, at *7 (D.D.C. July 16, 2014) ("[D]ismissal is by no

means required especially where, as here, Defendants have made no showing that the Relators'

participating during the course of the litigation will cause them undue burden or expense that

would justify limiting their participation.").

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss relator's second amended complaint will be denied except as to relator's allegations based on events occurring before August 24, 2003.  A separate Order accompanies this Memorandum Opinion.


_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:   March 31, 2015