## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA EX REL. DANI SHEMESH,**<br><br>                    **Plaintiff,**<br><br>          **v.**<br><br>**CA, INC.,**<br><br>                    **Defendant.** | **Civil Action No. 09-1600 (ESH)** |

## <u>MEMORANDUM OPINION AND ORDER</u>

The government, by relator Dani Shemesh, filed a complaint in intervention against defendant CA, Inc., alleging violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, as well as common law claims in connection with the sale of computer software licensed products and corresponding maintenance.  Defendant now moves to dismiss the government's amended complaint pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(6), and 12(b)(1). (*See* Def.'s Mem. in Supp. of Mot. to Dismiss, Jul. 3, 2014 [ECF No. 59] ("Def.'s Mem.").) This is the second motion to dismiss brought by CA, the first of which was to dismiss the relator's complaint and has been addressed in a separate Memorandum Opinion also issued this date.  (*See* Mem. Op., Mar. 31, 2015 [ECF No. 64] ("Relator's Mem. Op.").)  The Court will now address CA's motion to dismiss the government's complaint in intervention.  Given the overlapping issues of law and similar factual background, the Court need not repeat what has already been said, but will focus on the allegations in the government's complaint that raise different factual or legal issues.

**BACKGROUND**

## I.   GOVERNMENT'S ALLEGATIONS

Relator's false claims and false statements allegations date back to the negotiation of the initial MAS contract between CA and the GSA in 2001.  By contrast, the government's claims focus on events connected to the 2007 and 2009 contract renewal processes and thereafter.  Specifically, the government alleges that "[t]he information that CA provided to GSA in connection with the negotiation of the 2007 Contract extension and 2009 Contract extension pertaining to its commercial sales practices and its discounts was knowingly inaccurate and incomplete." (Gov. Am. Compl. ¶ 67.)  As a result of several false statements made during and subsequent to the contract renewal negotiations in 2007 and 2009, the government claims that it was fraudulently induced to enter into the two contract extensions, which in turn resulted in CA submitting false claims for payment throughout the contract extension periods.  (*See id.* ¶ 69.)  In addition to its FCA claims, the government also brings claims for breach of contract, payment by mistake, and unjust enrichment.

### a.   False statements during 2007 contract renewal

The initial MAS contract between CA and the government was set to expire in 2007, but the parties agreed to negotiate an extension.  (Gov. Am. Compl. ¶ 50.)  Concurrently, at the GSA's request, CA submitted a "Corrective Action Plan." (*See id*. ¶ 48.)  Because the Corrective Action Plan changes had not yet been finalized by the time the parties were negotiating a renewal, the parties agreed that any renewal of the MAS contract would be for one year rather than an additional five-year term.  (*See id*. ¶ 50.)  CA submitted a new CSP for SINs 132-32 (term software licenses) and 132-33 (perpetual software licenses).  (*See id.*)  The government alleges that "[b]ecause of CA's admitted failure to comply with the Price Reduction

Clause, CA offered GSA an additional discount of 15% for SINs 132-32 and 132-33 'during the requested twelve month extension; or until such time as CA has completed all our Action Plan items.'  That brought the total government discount for SIN 132-32 and 132-33 to 50%."  (*Id*.) According to the September 10, 2007 CSP, "Commercial end user ["CEU"] customers receive an average discount of 50%.  Absent the exclusions, Commercial End User customers represented more than 70% of sales in dollars."  (*Id*. ¶ 53 (quoting Sept. 10, 2007 CSP).)  CA also agreed that it would comply with the Price Reduction Monitoring Clause to maintain the static price relationship between the government and the basis of award customer.  (*See id*. ¶ 52.)

The government alleges that many of these statements were knowingly false.  The government has conducted a preliminary review of CA's sales database and discovered that CA offered CEUs a 72% average standard discount for SIN 132-32 and a 55% average standard discount for SIN 132-33.  (*See id*. ¶ 73.)  "As a result of CA's false statements, agencies of the United States paid more for CA licenses than they would have if CA had disclosed its true discounting practices and policies."  (*Id*. ¶ 74; *see also* ¶ 75.)

### b.  False statements during 2009 contract renewal

In 2009, the parties agreed to renew the contract for three more years.[1]  (*Id*. ¶ 55.)  In connection with the renewal negotiations, CA submitted separate CSPs on September 15, 2009, for SINs 132-32, 132-33, and 132-34 (maintenance).  (*See* Gov. Am. Compl. ¶ 55.)  This was the first time CA had submitted a separate CSP for the term (SIN 132-32) and perpetual (SIN 132-33) licensed products.  (*See id.*)  "In its 2009 CSP for SIN 132-32, under the section for standard discounts and pricing policies to commercial end users, CA represented that 'Commercial end

---

[1] The parties renewed the contract for an additional one-year term in 2008.  (*See* Gov. Am. Compl. ¶ 41.)  The government has not alleged any fraudulent conduct relating to the negotiation of the 2008 contract extension.

user customers receive an average discount of 78%. Commercial End User customers represent

more than 70% of sales in dollars.'" (*Id.* ¶ 56 (quoting Sept. 15, 2009 SIN 132-32 CSP).)  In this

same CSP, CA represented that it "offers the government CA's Mainframe product standard

license types at a discount of 45%, effective October 1, 2009." (*Id.*)  CA also disclosed that it

would continue to conduct quarterly reviews of the average discounts of CEUs and reduce the

GSA price as required by the Price Reduction Monitoring Clause. (*See id.* ¶ 57.)  CA made

similar representations with respect to the SIN 132-33 CSP that was submitted on the same date.

Specifically, CA stated that "[c]ommercial end users receive an average discount of 44%.

Commercial End User customers represent more than 70% of sales in dollars." (*Id.* ¶ 58 (quoting

Sept. 15, 2009 SIN 132-33 CSP).)  Further, CA represented that it "offers the government CA's

Distributed product standard license types at a discount of 45%, effective October 1, 2009." (*Id.*

¶ 59 (quoting Sept. 15, 2009 SIN 132-33 CSP).)  Again, CA agreed to maintain the price

relationship between the government and the average discount given to CEUs and to comply

with its obligations under the Price Reduction Monitoring Clause. (*See id.*)

The 2009 CSP that CA submitted for SIN 132-34 included a maintenance calculation

policy that was different from that disclosed in the 2001 CSP.  CA stated that "[e]ffective April

1, 2009, CA changed the [maintenance fee] calculation from List Price to 'net' fee, multiplied by

the then prevailing maintenance rate for the Product."[2]  (Gov. Am. Compl. ¶ 60 (quoting Sept.

15, 2009 SIN 132-34 CSP).)  In this CSP, CA also stated that "[d]iscounts provided to

Commercial End Users are between 0-28% based on the pre April 1, 2009 policy of maintenance

calculation on list price.  Commercial End User customers represent more than 70% of sales in

---

[2] Notably, this is the calculation process for maintenance that relator alleges was in effect during
the entire contract period, unbeknownst to the government. (*See* Relator's Mem. Op. at 2.)

dollars." (*Id*. ¶ 61.)  None of the 2009 CSPs referred to pay options.  (*See id.* ¶ 64.)  CA stated in its September 15, 2009 Final Proposal Revision letter "that all data submitted is accurate, current, and complete representations as of September 15, 2009."  (Gov. Am. Compl. ¶ 63 (quoting Sept. 15, 2009 Fin. Proposal Letter).)

The government alleges that the 2009 CSPs were "inaccurate, incomplete, and misled GSA."  (*Id*. ¶ 76.)  Again, based on analysis of CA's sales database, the government found that during the year preceding the submission of the SIN 132-34 CSP for maintenance, CA offered greater standard discounts to CEU customers than it had disclosed to the government, and on occasion, CEUs even received free maintenance.  (*See id.* ¶ 79.)  Consequently, the claims submitted to the government included inflated prices for maintenance.  (*See id.* ¶ 80.)

### c.  False statements during contract performance

The government also alleges that CA made false statements during the performance of the MAS contract.  CA requested modifications to the contract multiple times during the contract period.  After 2006, "CA expressly represented to the Government that its commercial discounting and pricing policies were the same as had been described in CA's original disclosures, except to the extent that CA had identified changes in its practices in subsequent CSPs."  (Gov. Am Compl. ¶ 82.)  In effect, these statements confirmed that the discount and pricing policies were the same as provided during the negotiation and renegotiation of the contract.  (*See, e.g.*, *id.* ¶¶ 83-106.)  The government alleges that these statements were knowingly inaccurate and incomplete.  (*See id.* ¶ 107.)  For example, one such statement was submitted on September 25, 2008, when the 2007 CSP controlled.  In this CSP, CA stated that CEUs receive an average discount of 50%, but the government's review of CA's sales data pertaining to the time CA certified that "there have been no changes to the commercial/discount

5

pricing policies and practices," showed that CA was giving CEU customers approximately an average standard discount of 64%.  (*Id.* ¶ 108.)

### d.  Failure to comply with the Price Reduction Monitoring Clause

The Price Reduction Monitoring Clause was designed to prevent overpayments from false disclosures, but the government alleges that "CA knowingly did not monitor its compliance with the Price Reductions Clause, as required by the Contract."  (Gov. Am. Compl. ¶ 112.)  The Price Reduction Monitoring Clause was part of the initial MAS contract, and CA confirmed it would abide by this provision during subsequent contract renewals.  (*See id.* ¶¶ 52, 57.)  In 2006, CA hired Pricewaterhouse Coopers ("PwC") to review CA's compliance with the Price Reduction Monitoring Clause.  (*See id.* ¶ 115.)  PwC reported to CA "that quarterly Price Reductions Clause reports were not being done and that certain quarterly reports from past years were missing entirely."  (*Id.*)  The government alleges that "[b]ased on the PwC review, CA eventually paid money to GSA, but failed to remit the proper amount," and even following the review, "CA failed to consistently conduct price reduction Monitoring and failed to maintain and retrieve accurate information from its sales database."  (*Id.* ¶ 117.)  In addition, CA inexplicably excluded CEUs with Enterprise License Agreements ("ELA") "when calculating discounts made to its Basis of Award customer for 2002 to 2012 to the present."  (*Id.* ¶ 118.)  According to the government, ELAs are a means to sell products and services rather than a category of customer, so some CEUs could have structured their agreements with CA as ELAs.  (*See id.* ¶ 120.)  This seems to have occurred at least a few times during the contract period.  For instance, in CA's 2009 CSPs for SINs 132-32, 132-33, and 132-34, CA defined CEU customers to include "[s]ome Enterprise License Agreements."  (*Id.* (quoting Sept. 15, 2009 CSP).)  But by excluding ELAs

with CEUs from the average discount calculation, CA knowingly withheld price reductions owed to the United States.  (*Id.* ¶ 121.)

The government filed an amended complaint in intervention on June 13, 2014.  In Count I, citing 31 U.S.C. § 3729(a)(1) (2006), or alternatively, 31 U.S.C. 3729(a)(1)(A), the United States alleges that defendant "knowingly presented, or caused to be presented, for payment or approval, false and/or fraudulent claims."  (*Id.* ¶ 127.)  Count II cites 31 U.S.C. § 3729(a)(1)(B) and alleges that defendant "knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim."  (*Id.* ¶ 132.)  In Count III, citing 31 U.S.C. § 3729(a)(7) (2006), or alternatively, 31 U.S.C. § 3729(a)(1)(G), the government alleges that defendant "knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government."  (*Id.* ¶ 137.)  Counts IV-VI allege common law claims for breach of contract, payment by mistake, and unjust enrichment, respectively.  (*Id.* ¶¶ 140-47.)

## II.    MOTION TO DISMISS

Defendant has filed a motion to dismiss the government's amended complaint,[3] arguing that the government's FCA allegations fail to state a claim under Rule 12(b)(6) and are not

---

[3] Along with its motion to dismiss, CA has provided contract documents that were incorporated by reference into the government's complaint in intervention.  These documents include the first two pages of the September 20, 2002 contract (*See* Def.'s Mem. Ex. A), letters incorporated into the contract dated June 27, 2002, and September 20, 2002 (*see id.* at Ex. B, C), CA's November 30, 2001, September 10, 2007, and September 30, 2009 CSPs (*see id.* at Ex. D, E, G), and the cover page of the 2009 contract modification document, MOD PS074 (*see id.* at Ex. F).  These documents are properly considered by the Court because the government frequently referenced them in setting forth its allegations.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (The court "must consider the complaint in its entirety . . . in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.").

sufficiently particular under Rule 9(b).  According to CA, the government cannot plead a theory

of fraud unless the representations are inconsistent with the contract documents, and the

government must allege with specificity that those representations, as defined by the relevant

contract documents, are in fact untrue.  This argument presupposes that the issues before the

Court are purely legal and can be resolved at this stage solely based on the limited record of

exhibits incorporated by reference.

CA argues that the government fails to allege any falsity because there is no claim that it

violated specific contract provisions.  (*See* Def.'s Mem. at 5.)  In particular, the government has

failed to state a claim because it does not contend that CEU customers with commitments of

$500,000 or less, outside of the enumerated exclusions,[4] received a higher discount for each of

CA's commercial pay options within a specific period of time.  With respect to inaccurate

discount disclosures, CA claims that the government's allegations do not amount to falsity

because the difference in the standard discounts identified by the government is due to a

misunderstanding of the contract language: namely, the government fails to take into account

that the average standard discount is 1) an average; 2) omits certain sales due to enumerated

exclusions; and 3) should not include ELAs.  (*See id.* at 7.)  CA also argues that its many

modification request statements that the government alleges were false did not certify that the

disclosed *prices* had not changed, but rather, only that the disclosed *pricing policies* had not

changed.  (*See id.* at 18.)  Alternatively, CA argues that even if the government has stated a claim

---

[4] "CA may deviate from its normal product license pricing practices" for the following four
exceptions: 1) Client Relations; 2) Competitive Replacements and Bids; 3) Contractual Rates;
and 4) Business Metric Deals.  (Def.'s Mem. Ex. B at 1-2.)

under Rule 12(b)(6), it has failed to provide sufficient particularity of the fraudulent circumstances to satisfy Rule 9(b).  (*See* Def.'s Mem. at 37.)

According to CA, the government's common law claims should also be dismissed.  CA argues that the Court does not have jurisdiction over the government's breach of contract claim because claims arising from government contracts that do not involve fraud must be filed with the Civilian Board of Contract Appeals or the Court of Federal Claims pursuant to the Contract Disputes Act.  (*See id*. at 41-42.)  Moreover, the payment by mistake and unjust enrichment claims are improper because these quasi-contract issues are only available in the absence of an express contract.  (*See id.* at 42-43.)

## ANALYSIS

For the reasons stated below, the Court will deny defendant's motion to dismiss.  The government's complaint satisfies the pleading requirements of Rules 12(b)(6) and 9(b), and based on the limited record before the Court, it does not agree that the many issues of contract interpretation present only legal issues (as opposed to factual issues) that can be resolved at this stage by the Court.  Because fraud is still an issue in this case, the breach of contract claim also survives.  In addition, the Court agrees with the government that its quasi-contract claims may go forward because the government has challenged the validity of the contract by pleading that it was fraudulently induced by CA's false statements.

## I.   FALSE CLAIMS ACT ALLEGATIONS

The False Claims Act provides liability for any person who "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes or uses . . . a false record or statement material to a false or fraudulent claim; . . . or (G) knowingly makes . . . a false record or statement material to an obligation to pay or transmit

money . . . to the Government, or knowingly conceals . . . an obligation to pay."  *See* 31 U.S.C.

3729(a)(1).  In addition to satisfying the requirements of Rule 12(b)(6), plaintiff is required to

plead the circumstances constituting fraud with sufficient particularity under Rule 9(b). [5]  The

parties do not dispute that CA submitted claims to the United States for payment, but they

disagree on the sufficiency of the government's allegations as to the remaining elements of an

FCA claim.

###### a.  Falsity

CA primarily bases its challenge to the government's complaint on the grounds that the

allegations regarding CA's statements, claims, or omissions are not false because they ignore the

relevant contract terms.  (*See* Def.'s Mem. at 5 ("The Government's allegations fail to show any

improper pricing or pricing disclosures by CA."); *see also* Def.'s Reply in Supp. of Mot. to

Dismiss, Aug. 8, 2014 [ECF No. 63] ("Reply") at 5 ("The Government's Opposition fails to

explain how its allegations of falsity are supported by – or even can be reconciled with – the

actual terms of the Contract and CSPs.").)  CA relies on contract documents to highlight

provisions that it claims the government ignored in crafting its theories of liability.  (*See* Def.'s

Mem. at 5.)  In this way, CA seeks to relegate the government's allegations to a matter of

contract interpretation that can be decided at the motion to dismiss stage, since the Court will not

need to resolve factual disputes, but only exercise "the purely legal function of contract

interpretation."  (Reply at 2.)  The Court, however, disagrees with the premise of CA's argument.

For instance, CA argues that the government's defective pricing theory regarding the

2009 CSP for maintenance does not allege any pricing inaccuracies of the "average" standard

---

[5] *See* Relator's Mem. Op. at 9-10 for a more expansive discussion of the legal standards under
Rules 12(b)(6) and 9(b).

discount disclosure.  (*See* Def.'s Mem. at 8.)  The government alleges that CA disclosed that its standard discounts for maintenance fees range between 0 and 28 percent, but it offered its CEU customers far greater discounts, including, at times, free maintenance.  (*See* Gov. Am. Compl. ¶¶ 78-79.)  CA cites a September 20, 2002 letter that was incorporated into the contract in which CA describes that the pricing arrangement initiated by the parties at the commencement of the contract was based on the "average discount of each Pay Option as specified in Computer Associates' average discount report."  (*Id.*)  This contract language, however, is irrelevant to the government's claim regarding the 2009 CSP.  The initial pricing arrangement for maintenance was not in fact based on an average standard CEU discount, but rather was calculated based on a percentage of the software license list price.  (*See, e.g.,* Relator's Mem. Op. at 4.)  Thus, the contract language CA cites does not support its argument that the government should have known that maintenance was calculated as an average.

In 2009, however, CA disclosed to the government that, effective April 1, 2009, it had changed its maintenance calculation policy "from List Price to 'net' fee, multiplied by the then prevailing maintenance rate for the Product."  (Gov. Am. Compl. ¶ 60 (quoting Sept. 15, 2009 SIN 132-34 CSP).)  CA argues that it disclosed to the government on the 2009 CSP that maintenance would be calculated as an average going forward, so it could not be liable for offering a maintenance discount to a CEU customer that was higher than the disclosed average. (*See* Def.'s Mem. at 9.)   Although CA identifies language in the contract materials that specifies that this disclosure was an average rather than a range (*see id.*), the government is similarly able to identify language incorporated into the contract that states otherwise.  (*See* Gov. Am. Compl. ¶ 61 ("In the 2009 CSP for SIN 132-34 . . . CA represented that 'Discounts provided to Commercial End Users are between 0-28% based on the pre April 1, 2009 policy of maintenance

calculation on list price.'")).)  At this stage, when the parties offer conflicting interpretations and

neither is more persuasive than the other based on the record, the Court must draw all fair

inferences in favor of the non-moving party.[6]  *United States v. Kellogg Brown & Root Servs.,*

*Inc.,* 800 F.Supp.2d 143, 160-61 (D.D.C. 2011).

    CA also argues that the government's FCA claims should be dismissed because they do

not specify which pay options were involved in the defective pricing or which period of time the

allegedly deeper discounts were available to CEU customers.  (*See* Def.'s Mem. at 11-14.)

However, the government is not required to plead falsity with the level of specificity that CA

demands.  To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  So long as

the plaintiff pleads facts that allow "the court to draw the reasonable inference that the defendant

is liable for the misconduct alleged," the motion to dismiss must be denied.  *Id.* at 663 (citing

*Twombly*, 550 U.S. at 555).  Details regarding the specific pay options involved in the sales at

issue, the specific period of time during which CA was required to calculate the difference

between the government's discounts and those offered to the basis of award customer, and the

appropriateness of the exclusions[7] cannot be determined based on the record.  At this point, it is

enough that the government's allegations are plausible.

---

[6] To be clear, the Court is not concluding that the contract is ambiguous, but only that the parties disagree over its interpretation.  "A contract is not rendered ambiguous merely because the parties disagree over its proper interpretation."  *Parker v. United States Trust Co.*, 30 A.3d 147, 150 (D.C. 2011) (quoting *Gryce v. Lavine*, 675 A.2d 67, 69 (D.C. 1996)).

[7] Although the government may not have attempted to calculate how the various exclusions affected CA's sales data, the Court is able to infer that the defendant is liable based on the government's allegations.  In addition, there may be a question of fact as to whether CA properly invoked various exclusions.  For example, in relator's second amended complaint, he mentioned

CA also posits that the government's allegations regarding the contract modification request statements fail to state a claim.  According to CA, these statements that verified that "[t]here have been no changes in commercial discount/pricing and practices" (*see, e.g.*, Gov. Am. Compl. ¶ 84) merely applied to the policies, not to the actual discounts, and "[n]owhere in the Amended Complaint does [plaintiff] identify any changes in CA's commercial discount/pricing 'policies and practices.'"  (Def.'s Mem. at 18.)

This very argument was raised and rejected in *United States ex rel. Frascella v. Oracle Corp.*, 751 F.Supp.2d 842 (E.D. Va. 2010).  There, the government alleged that "Oracle affirmatively stated on multiple occasions during performance of the contract . . . that '[t]here have been no changes in commercial discount/pricing policies and practices from that originally provided in response to . . . the solicitation.'"  *Id.* at 855.  In denying the defendant's motion to dismiss, the court held that those statements were false and were made with the intent to induce the GSA to enter into contract modifications.  *See id.*  The *Frascella* court understood the language at issue to refer to actual discounts, and not to some amorphous pricing policy as Oracle suggested.  *Id.*  The same conclusion applies here, since the government alleges that it was fraudulently induced into entering into the MAS contract modifications with CA in 2007 and 2009 by relying on false statements made during the renewal process and during the performance of the contract.  (*See* Gov. Am. Compl. ¶ 69 ("[T]he Government relied in deciding to extend the Contract on false statements made knowingly by CA.  Because CA fraudulently induced the

---

that in order to receive approval for significant discounts, CA employees merely had to tell CA officials that "the deal was 'a strategic deal.'"  (Relator's Mem. Op. at 21.)  The exclusion categories, which were defined and regulated by CA, could well have been abused to circumvent CA's obligations to the government under the MAS contract.  Therefore, CA's contention that the government did not properly take the disclosed exclusions into account does not negate the validity of the government's allegations.

United States to enter into the Contract extensions, each claim for payment made by CA under those extensions was a false claim.").)  Accepting the government's well-pleaded factual allegations as true, as it must at the motion to dismiss stage, the Court is satisfied that the government has adequately pled falsity with respect to CA's statements made during and subsequent to contract renewal, as well as to all claims submitted pursuant to the modified contract.

The government also alleges that CA made false statements regarding its compliance with the Price Reduction Monitoring Clause.  In a March 18, 2004 letter that was incorporated into the contract, CA stated that "CA has been passing the price decreases to the Government, maintaining the cost currently approved by GSA in the case of a price increase, and reporting and paying the IFF fees accordingly."  (Gov. Am. Compl. ¶ 114 (quoting March 18, 2004 letter).)  The PwC review in 2006 concluded that, contrary to CA's statements, CA had not been performing its quarterly Price Reduction Monitoring Clause reports and that "certain quarterly reports from past years were missing entirely."  (Gov. Am. Compl. ¶ 115.)  The government argues that even when CA eventually remitted money to GSA, it failed to pay the proper amount, partly because CA incorrectly excluded some sales (*i.e.*, ELAs with CEUs) from the average standard discount calculation.  (*See* Gov. Am. Compl. ¶¶116, 118.)  CA responds that the government is incorrect that ELA sales should be treated as CEU sales because ELAs are a separate category of customer.  (*See* Def.'s Mem. at 14.)  However, the contract materials indicate that at least after the 2009 contract extension, some ELAs should have been included in the average standard discount calculation.  (*See* Def.'s Mem. at Ex. G (defining Commercial End User customers to include "Some Enterprise License Agreements.").)  The government makes a plausible claim that it entered into the contract extensions because of this and similar

representations that defined the scope of CA's discounts relative to the discounts offered to the government.

According to the complaint, CA represented either explicitly or implicitly that the offered discounts would not be entirely whittled away by exclusions, exemptions, and non-standard categories, and they would be equivalent to those offered to CEU customers.  (*See, e.g.,* Def.'s Mem. Ex. G ("Commercial End User customers represent more than 70% of sales in dollars.").) And, that CA's false statements fraudulently induced the GSA to enter into contract extensions, and as a result, all subsequent claims for payment were false.  *See United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005) ("When Congress amended the FCA in 1986," . . . "Congress noted that, under FCA case law, 'each and every claim submitted under a contract, loan guarantee, or other agreement which was originally obtained by means of false statements . . . constitutes a false claim.'"); *see also United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 787-88 (4th Cir. 1999) (surveying case law on fraud in the inducement FCA liability).

### b.  Scienter

The False Claims Act defines "knowing" as actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of information.  *See* 31 U.S.C. § 3729(b)(1)(A). Although the government has not identified an individual who knew that CA was making false statements and submitting false claims to the government,[8] it has provided sufficient information to infer that, at the very least, CA recklessly disregarded the truth or falsity of the information it was providing to the government during and after the contract renewals.  The government has

---

[8] *See* Relator's Mem. Op. at 19-22 for further discussion of whether *scienter* requires plaintiff to identify specific individuals with the requisite knowledge.

conducted a preliminary review of some of CA's sales data and alleged that there is evidence to suggest that CA failed to accurately disclose its standard average discount to the government. (*See, e.g.*, ¶ 73.)  CA was obliged to review its sales data on a quarterly basis pursuant to the Price Reduction Monitoring Clause of the MAS contract, so it should have been aware that it was charging the government inflated prices throughout the contract.  According to the government, not only did CA fail to notify the government that the disclosed discounts were inaccurate, but it also submitted false statements throughout the contract period verifying that the pricing practices had not changed.  The government is only required to plead knowledge generally (*see* Fed. R. Civ. P. 9(b)), so it is enough that it is has set forth allegations that show CA recklessly disregarded the truth or falsity of the information it disclosed to the government. Thus, on the face of the complaint, the government has adequately pled that CA knowingly submitted false claims and made false statements to the government.

CA counters that the government cannot meet the *scienter* requirement because CA complied with an objectively reasonable reading of its CSP disclosures.  (*See* Def.'s Mem. at 29 (citing *United States ex rel. K & R Ltd. Partnership v. Mass. Hous. Fin. Agency*, 530 F.3d 980, 984 (D.C. Cir. 2008) (holding that an FCA violation cannot occur when the parties "simply disagree about how to interpret ambiguous contract language.")).)  However, the Court does not have all of the relevant materials to assess whether CA's position on its disclosure obligations is objectively reasonable.  Without these documents, the Court cannot determine whether the government's claims are purely a matter of contract interpretation.  *See Kellogg Brown & Root Servs. Inc.*, 800 F.Supp.2d at 159 ("Given the allegations the government has put forward, however, further factual material is required before the Court can determine whether the claims at issue here involved only a contractual dispute.").

### c.   Materiality

Further, CA argues that the government has failed to adequately allege materiality because the discounts negotiated on the basis of the CSPs set a ceiling for prices, and individual agencies were able to negotiate for better prices.  (*See* Def.'s Mem. at 26.)  The Price Reduction Monitoring Clause would also have prevented any harm from alleged misrepresentations.  The MAS contract regulations provide that "[a]lthough GSA has already negotiated fair and reasonable pricing, ordering activities may seek additional discounts before placing an order."  48 C.F.R. § 8.404(d).  However, the assumption built into this regulation is that the contract price is fair and reasonable and is based on complete and accurate data.  As alleged by the government, the contract prices negotiated by the parties were inflated under fraudulent circumstances.  Thus, any negotiations for lower prices by individual agencies would have been similarly conducted under fraudulent conditions.  Moreover, the government has cited several examples of individual agencies purchasing CA products at inflated prices.  (*See, e.g.,* Gov. Am. Compl. ¶¶ 75, 80.)

CA's Price Reduction Monitoring Clause argument is also unpersuasive.  As discussed in the Relator's Mem. Op. at 23-24, the Price Reduction Monitoring Clause was alleged to be ineffective throughout the contract.  Moreover, the government claimed that even when CA conducted quarterly reports and reduced the government's prices accordingly, the amount remitted was inaccurate because CA inappropriately excluded some sales from the average standard discount calculation.  (*See* Gov. Am. Compl. ¶ 117.)  For example, accepting the government's allegations as true, the ELA sales should have been included in the discount calculations because they were utilized by some CEU customers at least since 2009.  (*See id.* ¶

120.)  Therefore, the Price Reduction Monitoring Clause did not negate the materiality of CA's

false statements on the government's decision to pay inflated prices.

### d.  Particularity

An FCA plaintiff must plead "with particularity the circumstances constituting fraud."

Fed. R. Civ. P. 9(b).  In other words, the plaintiff "must state the time, place and content of the

false misrepresentations, the facts misrepresented and what was retained or given up as a

consequence of the fraud."  *Kowal v. MCI Commc'ns Corp.,* 16 F.3d 1271, 1278 (D.C. Cir.

1994).  The government has satisfied this test.  The government provided several examples of

allegedly false statements made during contract renewal and the contract period.  (*See, e.g.,* Gov.

Am. Compl. ¶¶ 71-73, 78-79, 83-106.)  It also specified when these statements were made and in

relation to which parts of the contract.[9]  (*See id.*)  Although CA might disagree on the falsity of

these statements, it is aware from the details of the complaint which statements and claims are

alleged to be false.  "While the government conceivably could have provided additional details

. . . the same could be said of virtually every complaint, particularly those based on multiple

claims and lengthy, complex government contracts.  What matters here is that the complaint

fulfills Rule 9(b)'s underlying purpose of providing [the defendant] with 'sufficient notice of the

claims against [it] to prepare a defense.'"  *Kellogg Brown & Root Servs. Inc.*, 800 F.Supp.2d at

153-54.  This is especially true when CA has access to the claims it submitted to the government.

*See id.*  Further, the "'D.C. Circuit has taken a generous approach to pleadings' in the FCA

context, finding that 'a complaint is not deficient even if it fails to set out a prima facie case as an

initial matter.'"  *Id.* at 154 (quoting *United States ex rel. Ortega v. Columbia Healthcare, Inc.*,

---

[9] *See* Relator's Mem. Op. at 24-26 for further discussion of the contours of Rule 9(b) and its
application to this case.

240 F.Supp.2d 8, 18 (D.D.C. 2003)).  Therefore, the government has satisfied its pleading

obligation under Rule 9(b).

## II.        COMMON LAW ALLEGATIONS

CA moves to dismiss the government's breach of contract claim for lack of jurisdiction

under Rule 12(b)(1) because "the Court does not have jurisdiction over breach of contract claims

arising from a government contract."  (Def.'s Mem. at 41-42 (citing 41 U.S.C. §§ 7101 *et seq*.).)

The Contract Disputes Act ("CDA") provides that breach of contract claims should be filed in

the Civilian Board of Contract Appeals or the Court of Federal Claims.  *See* 41 U.S.C. §§

7104(b)(1), 7105(e)(1)(B).  However, the CDA's mandatory jurisdiction "does not apply to a

claim by the Federal Government against a contractor that is based on a claim by the contractor

involving fraud."  41 U.S.C. § 7103(a)(4)(B).  As discussed above, the government's FCA

claims survive defendant's motion to dismiss, and "there can be no doubt that a pending False

Claims Act claim 'involves' fraud."  *Kellogg Brown & Root Servs., Inc.,* 800 F.Supp.2d at 160.

Thus, because CA's only argument against the government's breach of contract claim is easily

overcome, CA's motion to dismiss the breach of contract claim is denied.

Similarly, CA's motion to dismiss the government's payment by mistake and unjust

enrichment claims is denied.  CA relies on the well-established doctrine that "there can be no

claim for unjust enrichment when an express contract exists between the parties."  *Albrecht v.*

*Comm. on Employee Benefits of the Fed. Reserve Employee Benefits Sys.*, 357 F.3d 62, 69 (D.C.

Cir. 2004) (quoting *Schiff v. Am. Ass'n of Retired Persons*, 697 A.2d 1193, 1194 (D.C. 1997)).

Payment by mistake, another quasi-contractual claim, is similarly inappropriate when the

existence of a contract is not at issue because "there is, of course, no need to resort to quasi-

contract when the evidence sustains the existence of a true contract." *Bloomgarden v. Coyer*, 479 F.2d 201, 210 (D.C. Cir. 1973).

However, the government has alleged that its contract with CA may be invalid because it would not have entered into it but for CA's fraudulent conduct. (*See* Gov. Am. Compl. ¶ 68 ("[T]he government would not have agreed to the discount levels in the Contract extensions and the price it paid for CA products had CA made accurate, complete, and current disclosures."), ¶ 69 ("CA fraudulently induced the United States to enter into the Contract extensions.").) CA characterizes the government's theory as novel (*see* Reply at 23), but this Court's review of this jurisdiction's case law indicates otherwise. *See, e.g., United States ex rel. Landis v. Tailwind Sports Corp.*, No. 10-cv-976, 2014 WL 2772907, at *38 (D.D.C. June 19, 2014) (the court did not dismiss the government's unjust enrichment claim despite the existence of an express contract that was allegedly induced by fraud); *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 685 F.Supp.2d 129, 141-42 (D.D.C. 2010) (same); *see also Frascella*, 751 F.Supp.2d 842 at 856 (same). Further, this Court has previously noted that "at the motion-to-dismiss stage, courts in this district and elsewhere have permitted the government to proceed with claims alleging FCA violations as well as claims for unjust enrichment or payment by mistake." *United States ex rel. Purcell v. MWI Corp.*, 254 F.Supp.2d 69, 79 (D.D.C. 2003). However, a plaintiff may not recover damages on legally inconsistent theories. *See id.* Because some of the government's claims allege violations of MAS contract regulations rather than just contractual violations, it would be premature at this time to decide whether the government's theories for recovery are mutually exclusive.

**CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED** that defendant's motion to dismiss the government's amended complaint in

intervention is **DENIED**.

**SO ORDERED**.


/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date:   March 31, 2015