## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*<br><br>Dani Shemesh,<br><br>      Plaintiff,<br><br>           v.<br><br>CA, INC.,<br><br>      Defendant. | Civil Action No. 09-1600-ESH |

## <u>MEMORANDUM OPINION</u>

United States District Judge Ellen S. Huvelle referred this case to the undersigned for a determination of Defendant CA's Motion to Compel ("Motion") [81]. (*See* Judge Huvelle's Oct. 8, 2015 Order). Defendant CA moves this Court to compel the Plaintiff United States of America to produce documents relating to 1) the claims for which the United States intends to seek damages under the False Claims Act (Requests for Production 15, 26, and 27), and 2) the General Services Administration's ("GSA") proposed rule to eliminate a government contract clause known as the "Price Reduction Clause" (Requests for Production 16, and 18-22). (*See* Def.'s Mot. at 1.) Plaintiff United States filed an Opposition [82] and Defendant CA filed a Reply [88]. On December 9, 2015, the undersigned held a Hearing on Defendant's Motion. (Dec. 9, 2015 Min. Entry). Upon consideration of the motions and supporting documents, the testimony at the hearing, and for the reasons set forth below, Defendant's Motion is granted in part and denied in part.

**BACKGROUND:**

A.      **Plaintiffs' Underlying False Claims Act Complaints**

The underlying case stems from complaints filed by Plaintiffs alleging that Defendant CA defrauded GSA and other federal agencies by failing to disclose to GSA discounts on their products that they gave to other consumers.  (Sec. Am. Compl. ("SAC") [44]; Intervenor's Am. Compl. ("IAC") [55].)  CA is one of the leading manufactures of software for computers, primarily selling software licenses and maintenance packages. (SAC ¶ 17.)  Because the Government is such a large and powerful purchaser of goods and services, GSA takes advantage of the bargaining position and contracts on behalf of the entire Government through a contracting mechanism known as a "Multiple Award Schedule" ("MAS") contract.  (*Id.* ¶ 11.)  This way, each individual Government office does not have to enter into separate price negotiations and has much more leverage than if it were acting alone.  (*Id.*)  Accordingly, when a Government agency wishes to purchase an item that was part of a MAS contract, the agency can purchase the item from the vendor at the price that was previously negotiated between the vendor and GSA (or, depending on the size of the contract, the agency may negotiate for even deeper discounts than provided by the MAS contract).  (*Id.*)

To negotiate a MAS contract, vendors are required to provide GSA with a catalog (called a "Consumer Sales Practices" form) that lists the lowest prices they have sold their items to other consumers.  *See* 48 C.F.R. § 515.408; (IAC ¶ 26.)  GSA and the vendor then negotiate and typically agree to the best price that has been offered to the vendor's other customers.  *See* General Services Acquisition Manual ("GSAM") § 538.70(c); (IAC ¶ 29).  If the vendor does not offer its best price, then it is supposed to provide an explanation so that GSA can determine if the offered price is "fair and reasonable, even though comparable discounts were not negotiated,"

and if the contract is still in the "best interest of the Government."  GSAM § 538.270(d); (*see also* IAC ¶ 29).

After the MAS contract is awarded, the vendor is required to maintain the negotiated price and discount relationship.  GSAM § 538.272(a); (*see also* IAC ¶ 31).  The MAS contract typically includes a "Price Reduction Clause" ("PRC") which requires vendors to consistently monitor their pricing over the lifespan of the contract and provide the Government with the same price reductions that they give to other comparably situated consumers (sometimes referred to as the PRC's "tracking customer requirement").  GSAM § 538.272(a); (*see also* IAC ¶ 31).

On September 26, 2002, CA entered into a MAS contract with GSA, Contract Number GS-35F-08232M.  (IAC ¶ 37.)  As required, CA submitted a Consumer Sales Practices ("CSP") form listing its lowest prices, and the contract included a PRC which guaranteed that the Government would receive the "best price" to purchase CA's products.  (IAC ¶ 47.)  The contract originally spanned from 2002 to 2007.  (IAC ¶ 41.)  The contract was extended from 2007 to 2008.  (*Id*.)  The contract was extended for another one-year term, from 2008-2009.  (*Id*.)  The contract was extended for an additional three-year term, from 2009-2012.  Finally, the contract was extended again from 2012 to March 2014 (the date the United States filed its Complaint in Intervention). (*Id.*) Under the contract and its extensions, various agencies, offices, and entities have purchased hundreds of millions of dollars of items through blanket purchase agreements ("BPA"), which allow them to adopt the terms and prices from the GSA MAS contract.  (SAC ¶ 27.)

On August 24, 2009, an employee of CA, Dani Shemesh ("Relator"), filed a complaint against CA alleging that it had violated the False Claims Act in its dealings with the

Government.  (Compl. [1]; *see also* SAC ¶¶ 61-66.)[1]  In particular, Relator alleges that in the process of negotiating the GSA MAS contract, CA lied to the Government about giving it its best price, because CA had actually given other consumers much lower prices and never disclosed this information to the Government.  (*See* SAC ¶ 51.)  As a result, the claims submitted by CA pursuant to the MAS contract, or pursuant to the BPAs formed on the basis of the MAS contract, were false.  (*See id.*)  Further, Relator alleges that CA's failure to disclose this information pursuant to the PRC resulted in additional false statements made throughout the contract.  (*See id.*)

On August 19, 2010, GSA's Office of Inspector General ("OIG") issued a subpoena to CA.  (GSA OIG Subpoena [81-5] at 2.)  The subpoena sought information to help the United States determine whether any transactions were fraudulent and whether it would intervene in Relator's case.  (Pl.'s Opp. at 3.)  CA responded to the subpoena by producing its sales database. (Def.'s Reply at 4.)  During its investigation from 2010 to 2014, GSA OIG identified eleven of CA's transactions as being of "significant concern."  (Dec. 9, 2015 Mot. Hr'g.)

On March 24, 2014, the United States filed a Complaint in Intervention.  (Intervenor's Compl. [42]; *see also* Intervenor's Am. Compl. ("IAC")) [55].)[2]  In the Complaint, the United States provides a series of 18 examples of allegedly fraudulent transactions whereby CA purported to give the Government the best price and failed to disclose that it actually had given other consumers more favorable discounts; however, the United States did not include the eleven transactions that it identified as being of "significant concern" in its Complaint.  (IAC ¶¶ 75, 80, 111.)  The United States alleges in part that Defendant violated three provisions of the False

---

[1] Relator filed a Complaint [1] on August 24, 2009.  Relator filed a First Amended Complaint [6] on August 19, 2010.  Relator filed a Second Amended Complaint ("SAC") [44] on April 11, 2014.
[2] The United States filed a Complaint in Intervention [42] on March 24, 2014.  The United States filed an Amended Complaint in Intervention ("IAC") [55] on June 13, 2014.

Claims Act:  In Count I, the United States alleges "Defendant knowingly presented, or caused to be presented, for payment or approval, false and/or fraudulent claims . . . to the United States, which the United States paid" in violation of 31 U.S.C. § 3729(a)(1) (2006) and 31 U.S.C. § 3729(a)(1)(A) (West 2010).  (IAC ¶ 127.)  In Count II, the United States alleges "Defendant knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim . . . to get the United States to pay or approve false or fraudulent claims" in violation of 31 U.S.C. § 3729(a)(1)(B) (2009).  (IAC ¶ 131.)  In Count III, the United States alleges "Defendant knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government" in violation of 31 U.S.C. § 3729(a)(7) (2006) and 31 U.S.C. § 3729(a)(1)(G) (West 2010).  (IAC ¶ 136.)  Plaintiffs contend that all these fraudulent transactions taken together have resulted in the Government overpaying at least $100 million.  (*See* SAC ¶¶ 63, 66.)

> ## B. Discovery

On April 22, 2015, Judge Huvelle ordered that fact discovery be completed by February 22, 2016, and the remaining discovery (expert discovery) by April 22, 2016.  (Scheduling Order [76]).

In June and July of 2015, CA served the United States its first and second requests for production of documents, totaling 37 requests.  (First Req. [81-7]; Sec. Req. [81-8].)  Requests 1-14 sought documents related to the 18 examples that the Government listed as allegedly fraudulent in its Amended Complaint.  (First Req. at 7-14.)  Request 17 sought documents relating to the impact and effect of the PRC in MAS contracts.  (*Id*. at 20; Def.'s Reply at 16.)

The Government has produced nearly 7,000 pages of documents in response to the 37 requests and claims to be continuing to produce documents. (Pl.'s Opp. at 4.) The Government, however, refuses to produce documents for Requests 15, 16, 18-22, 26, and 27. (Pl.'s Opp. at 1.) The parties conferred multiple times to attempt to resolve the discovery disputes but have been unsuccessful in reaching a resolution. (*See* Jonathan Su Aff. [81-2] at 3-4.)

On October 7, 2015, Defendant CA filed a motion to compel the Plaintiff United States to produce documents relating to 1) the claims for which the United States intends to seek damages under the FCA (Requests for Production 15, 26, and 27), and 2) the GSA's proposed rule to eliminate the PRC from MAS contracts (Requests for Production 16 and 18-22).

1.   Requests 15, 26, and 27

Requests 15, 26, and 27, seek documents relating to transactions that the Government intends to claim were fraudulent and accordingly seek damages:

> Request 15 seeks all documents or communications relating to the eleven transactions between the Government and CA that the Government had identified as being of "significant concern" in its prior investigation (but did not list as examples of fraudulent transactions in its Complaint).
>
> Request 26 seeks all documents or communications relating to any transaction for which the Government alleges it was overcharged and intends to claim damages.
>
> Request 27 seeks all documents or communications relating to any guidance, memoranda, and policies for placing orders under GSA contracts by ordering agencies.

(First Req. [81-7] at 17; Sec. Req. [81-8] at 7; Dec. 9, 2015 Mot. Hr'g) (Request 15 is modified by the undersigned to incorporate clarifying details that were disclosed at the Dec. 9, 2015 Motion Hearing.)

The Government objects to producing these documents on the basis that it cannot provide this information until CA first produces an intelligible database listing its sales. (Pl.'s Opp. at 2.) The Government claims CA's sales data is a necessary predicate to identifying the relevant transactions for which the Government will seek damages because CA's sales data will show

whether CA gave more favorable discounts to other consumers than the Government and whether it failed to disclose such information.  (*Id.*)  If CA failed to disclose such information, the Government will identify the transactions as fraudulent and likely seek damages.  (*Id.*; *see also* Pl.'s Initial Disclosures [82-2] at 9.)  While the Government does not dispute the potential relevance of these requests, it argues that it should be permitted to provide responses after CA has provided more information.  (Pl.'s Opp. at 11.)

CA claims that the Government's statements about it needing an intelligible sales database are a red herring because it has already provided the database to the Government. (Def.'s Mem. [81-1] at 2.)  CA argues that the Government is impeding its ability to conduct proper discovery because CA does not know what transactions are at issue and does not have the documents that would allow it to depose the witnesses who identified transactions as fraudulent. (Def.'s Reply [88] at 7.)  CA mentions that if the Government truly has a need for further information, it can request it through a motion to compel, which it has failed to do up to this point.  (*Id.* at 11.)

2.      Requests 16 and 18-22

Request 16 seeks "all documents and communications relating to GSA's proposed rule to eliminate the Price Reduction Clause, as published at 80 Fed. Reg. 11,619 (Mar. 4, 2015)." (First. Req. [81-7] at 20; *see also* 80 Fed. Reg. 11619 (Mar. 4, 2015), attached as Mot. Ex. A [81-3].)

Requests 18-22 seek all documents and communications relating to excerpted statements in GSA's proposed rule to eliminate the PRC.  (First Req. at 20.)  For the sake of fullness and simplicity, the following includes the relevant sections of the proposed rule and lists the excerpted statements for which CA seeks further information in bold and italics:

## Background

In Fiscal Year 2014, Government agencies ordered nearly $39 billion in goods and services through GSA's FSS contracts. [ . . . ] While GSA has a number of policies in place to help its buyers and agency users to secure best value for the taxpayer, two limitations in current pricing practices make achievement of this goal unnecessarily challenging: (1) Lack of visibility into prices paid by other customers; and (2) insufficient attention on "horizontal pricing" under the FSS program—*i.e.,* the ability to compare one vendor's pricing to that of other vendors.

### [1] Lack of Transparency in Prices Previously Paid

[Omitted discussion.]

### [2] Use of Vertical Pricing and Movement Toward Both Vertical and Horizontal Pricing in the FSS Program

The FSS program is currently built around a vertical pricing model where pricing offered to the Government from a potential vendor is compared to the pricing that the same vendor offers to its commercial customers. When vendors first submit an FSS offer, minimal consideration is given to the relative competitiveness of the vendor's prices to other vendors (*i.e.,* horizontal pricing). [ . . . ] The Government's negotiation objective is to achieve a company's best price—*i.e.,* the price given to its most favored customer (see GSAR 538.270(a)) who buys in quantities and under conditions similar to those of the Government. Contractors are then required, under the "price reductions" clause (PRC), to monitor their pricing over the life of the contract and provide the Government with the same price reductions that they give to the class of the contractor's commercial customers upon which the original contract award was predicated (see GSAR 552.238-75). In addition to the "tracking customer" requirement, the price reductions clause allows vendors to voluntarily reduce prices to the Government and for the Government to request a price reduction at any time during the contract period such as where market analysis indicates that lower prices are being offered or paid for the same items under similar conditions.

The required disclosure of commercial sales practices and the PRC were first introduced into the FSS program in the 1980s as a way to ensure fair and reasonable pricing through the life of a contract with the goal of achieving most favored customer pricing. For many years, the tracking customer feature of the PRC was a critical mechanism for enabling GSA and its customers to maintain good pricing from original equipment manufacturers who held the vast majority of FSS contracts. ***However, changes in the Federal market have lessened the impact of the tracking customer mechanism over time.*** [Request 19.] Of particular note, an increasing percentage of FSS contractors are resellers with little or no commercial sales. The GSA Inspector General (IG) recently reported that resellers represent more than one-third of FSS vendors. [ . . . ]

***Moreover, due to the various exceptions included in the PRC the tracking customer feature ties pricing for reductions to sales of single items***

8

*and plays little role in blanket purchase agreement and order purchases reflecting volume sales. Further, many products sold under the FSS program are commercial-off-the-shelf (COTS) products or other commercial items for which the Government is not a market driver.* [Request 20.]

*The Government, and other customers in the category to which the Government is most typically aligned under the price reductions clause, tend to receive voluntary price reductions from the vendor as a result of general market forces (e.g., intense competition and small profit margins within the IT hardware arena that cause vendors to lower their prices for all customers voluntarily to maintain market share). In other words, prices are reduced under the voluntary provisions of the price reduction clause as a result of market rate pricing changes, not under the mandatory tracking customer provisions.* [Requests 18 and 20.]

*GSA recently analyzed modifications issued between October 1, 2013 and August 4, 2014 under nine of its FSS contracts, including Schedule 70 (Information Technology), Schedule 874 (Mission Oriented Business IntegratedSolutions (MOBIS)), Schedule 66 (Scientific Equipment and Services), Schedule 84 (Total Solutions for Law Enforcement, Security, Facilities Management, Fire, Rescue, Clothing, Marine Craft and Emergency/Disaster Response), Schedule 899 (Environmental Services), Schedule 738 II (Language Services), 874 V (Logistics Worldwide), Schedule 871 (Professional Engineering Services), and Schedule 00CORP (The Consolidated Schedule). GSA found that only about 3 percent of the total price reductions received under the price reduction clause were tied to the "tracking customer" feature. The vast majority (approximately 78 percent) came as a result of commercial pricelist adjustments and market rate changes, with the balance for other reasons. This finding supports attempting a different means of making better pricing available.* [Request 21.]

Simultaneous with these trends, significant improvements in technology now make it possible to collect transactional data and display it in a way that Government customers can see the prices paid by other FSS customers along with other data to determine whether prices offered to them represent the best value to the taxpayer. As explained above, the required disclosure and sharing of prices paid information through the use of a transactional data reporting clause and portal under the OS2 pilot led to savings rates averaging approximately 18 percent, or about 4.5 percent higher than pre-dynamic pricing.

*GSA believes the collection and use of transactional data may be a more efficient and effective way for driving price reductions on FSS buys than through use of the tracking customer mechanism. In addition to avoiding the challenges associated with the tracking customer mechanism described above, the transactional data reporting clause would allow for greater reliance on horizontal pricing in the FSS program so that GSA and its customers can easily evaluate the relative competitiveness of prices between FSS vendors.* [Request 22.] [. . .]

*See* 80 Fed. Reg. 11619, 11621 (Mar. 4, 2015), attached as Mot. Ex. A [81-3].

CA argues that documents relating to the above statements in bold and italics are relevant because they refer to factual findings by GSA that "directly addresses the impact of the PRC on the prices paid by Government customers, the reliance placed on the PRC by GSA, and contractors' difficulties in complying with the PRC requirements." (Def.'s Mem. at 26-27.)  In other words, CA wants to use these documents to establish that the PRC was not relied upon by GSA and other ordering agencies, or that contractors struggled to comply with the PRC, thereby undercutting the materiality or knowing elements of the Government's FCA claim. (*See id.* at 22.)

The Government objects to these requests on grounds that they are irrelevant. (Pl.'s Opp. at 12.)  The Government argues that this case is about CA's obligations under the MAS contract that spanned from 2002 to 2014, and requests for documents regarding a 2015 GSA proposed rule distract from the issues. (*Id.* at 13.)  The Government also notes that the proposed rule mentioning that the PRC has a limited impact refers to the Government receiving even better deals than the PRC requires because vendors are voluntarily reducing their prices because of competition and market forces. (*Id.* at 12-13.)  Accordingly, these requests are irrelevant because "if CA has voluntarily given the Government deeper discounts than required by its price reduction clause, the Government will not have damages." (*Id.* at 14.)

## C.   Hearing on Motion to Compel

On December 9, 2015, the parties appeared before the undersigned for a hearing on the Motion to Compel ("Motion Hearing").  The parties reiterated the arguments they included in their briefings and offered clarifying details to the requests for production. (*See* Dec. 9, 2015 Mot. Hr'g.)

10

Regarding Request 15, CA clarified that these eleven transactions were identified by the Government as being of "significant concern" in its earlier investigation, but the Government did not include them in its Amended Complaint.  (*Id.*) While not disputing that these transactions were previously identified as being of "significant concern," the Government argued that this request is presently irrelevant because the Government has not yet definitively decided whether the transactions are fraudulent, and thus has not yet decided whether it will pursue damages. (*Id.*)

Regarding Requests 16 and 18-22 about GSA's proposed rule, CA stated that it wanted "just the facts," meaning only data studies and investigations undertaken in conjunction with creating the proposed rule, and not drafts or privileged information.  (*Id.*) CA mentioned that it is particularly interested in obtaining the information that spurred GSA's decision to propose eliminating the PRC. (*Id.*) Based on the excerpted statements, CA contends that the data studies and investigations will show that that the Government has viewed the PRC as a "relic" and has not relied on it for years. (*Id.*) CA reiterated that such findings would undercut the materiality element of the Government's FCA claim. (*Id.*)

Regarding Requests 26 and 27, CA clarified that it is still continuing to provide the Government with information regarding its sales database, but believes that it has already provided the Government with sufficient information for it to respond to these requests.  The parties also informed the Court that Judge Huvelle held a status conference just hours before the Motion Hearing and stayed discovery for an additional three months to allow the parties to determine a suitable method for analyzing Defendant's sales databases and to engage in settlement discussions.  (*See* Judge Huvelle Dec. 9, 2015 Order [93].)

Finally, the parties argued that the recent amendments to the Federal Rules of Civil Procedure do not alter their respective positions.  (Dec. 9, 2015 Mot. Hr'g.) The Government

maintained that because CA's requests are largely irrelevant, any production is therefore disproportional to the needs of the case. (*Id.*) CA maintained that its requests are both relevant and proportional to the needs of its case. (*Id.*)

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 34, a party may request the production of "any designated documents or electronically stored information stored in any medium from which information may be obtained within the scope of Rule 26(b)." If a party fails to produce the documents as requested under Rule 34, a party may move for an order compelling disclosure after attempting to confer with opposing party in an effort to resolve the dispute without court action. Fed. R. Civ. P. 37.

Effective on December 1, 2015, Federal Rule of Civil Procedure 26(b)(1) has been amended to provide:

> Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense *and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.*

Fed. R. Civ. P. 26(b)(1) (emphasis added to identify the amendment). This amended version "shall govern . . . in all proceedings in civil cases . . . and, insofar as just and practicable, all proceedings then pending." C.J. Robert's Order to Am. Fed. R. Civ. P. Thus, considerations of both relevance and proportionality now govern the scope of discovery. *See* Fed. R. Civ. P. 26(b)(1); Fed. R. Civ. P. 26(b)(1) advisory committee's notes to 2015 amendment.

Like before, relevance is still to be "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on" any party's claim or

defense. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).  Moreover, information still "need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1).  The amendment deleted the "reasonably calculated to lead to the discovery of admissible evidence" phrase, however, because it was often misconstrued to define the scope of discovery and had the potential to "swallow any other limitation."  *See* Fed. R. Civ. P. 26(b)(1) advisory committee's notes to 2015 amendment.

The consideration of proportionality is also not new, as it has been part of the federal rules since 1983.[3]  *Id.* Despite the longstanding existence of proportionality provisions in the rules, however, many courts simply did not apply them.  *Id.* The amendment thus relocates the proportionality factors to Rule 26(b)(1) to "encourage judges to be more aggressive in identifying and discouraging discovery overuse" and to make proportionality considerations unavoidable.  *Id.*

In cases where a relevancy objection has been raised, the party seeking discovery must demonstrate that the information sought to be compelled is within the scope of discoverable information under Rule 26.  *Meijer, Inc. v. Warner Chilcott Holdings Co., III, Ltd.,* 245 F.R.D. 26, 30 (D.D.C. 2007) (citing *Alexander v. FBI,* 194 F.R.D. 316, 325 (D.D.C. 2000)); *see also* Fed. R. Civ. P. 26(b)(1) advisory committee's notes to 2015 amendment ("[T]he change does not place on the party seeking discovery the burden of addressing all proportionality considerations" and "the parties' responsibilities would remain" as they were under previous iteration of the rules).  Once the relevancy of the material sought has been established, the objecting party then

---

[3] Rule 26(b)(2)(C) previously directed the court to limit discovery if it determined that the "burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issue at stake in the litigation, and the importance of the proposed discovery in resolving those issues." Similarly, Rule 26(g)(1)(B)(iii) required a lawyer to certify that its discovery request, response, or objection was "neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action."

bears the burden of "showing why discovery should not be permitted." *Alexander*, 194 F.R.D. at 326 (quoting *Corrigan v. Methodist Hosp.*, 158 F.R.D. 54, 56 (E.D. Pa. 1994)).

Trial courts have considerable discretion when handling discovery matters, and "a district court's decision to permit or deny discovery is reviewable only for an abuse of discretion." *Food Lion, Inc. v. United Food and Commercial Workers Int'l. Union,* 103 F.3d 1007, 1012 (D.C. Cir. 1997). "On motion or on its own, the court must limit the frequency or extent of discovery if it determines that the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(5)(C).

## DISCUSSION

### A.     Request 15 is Granted

Request 15 seeks all documents or communications relating to eleven transactions between the Government and CA that the Government had identified as being of "significant concern" in its earlier investigation, but did not list as examples in its Amended Complaint. (First Req. [81-7] at 17; Dec. 9, 2015 Mot. Hr'g.) The Government argues this request should be denied because, similar to Requests 26 and 27, it cannot provide these documents until CA produces an intelligible database listing its sales. (Def.'s Opp. at 11.) Furthermore, because the Government has not yet identified these transactions as fraudulent in this action (and only as transactions of significant concern in its earlier investigation), it argues that these transactions may ultimately be irrelevant if the Government decides not to pursue damages for them. (*Id.*)

The undersigned is not persuaded by either justification. In order to classify these eleven transactions as being of "significant concern," the Government presumably possessed documents to support these contentions. Hence, the fact that the Government has previously identified these transactions as being potentially fraudulent seems to contradict its current position. Moreover,

unlike Requests 26 and 27 seeking documents relating to all of the Government's future claims for damages, Request 15 seeks documents related to specifically identified transactions; that is, it is unclear why the Government would need CA's database to identify the documents given that they have already been identified for the Government by CA.

Lastly, the argument that these transactions may ultimately be irrelevant if the Government decides not to pursue damages for them is unconvincing because the Government, as plaintiff in this case, has all the power to determine whether it will seek damages. The implication of this argument is that the Government could strategically delay production of documents in its custody to impede defense counsel's ability to develop and defend its case. Without such information, defense counsel's ability to defend CA is impeded because it does not know what transactions are at issue, and does not have the documents that would allow it to conduct further discovery, such as deposing witnesses. As such, the Government should provide all the documents it currently has that are responsive to Request 15 and continually supplement them if more information becomes available in accordance with Rule 26(e). Request 15 is thus granted.

### B.   Requests 16 and 18-22 are Denied

Request 16 seeks "all documents and communications relating to GSA's proposed rule to eliminate the Price Reduction Clause, as published at 80 Fed. Reg. 11,619 (Mar. 4, 2015)," and Requests 18-22 seek all documents and communications relating to the following excerpted statements within GSA's proposed rule to eliminate the PRC:

- Request 18: The Government, and other customers in the category to which the Government is most typically aligned under the price reductions clause, tend to receive voluntary price reductions from the vendor as a result of general market forces (e.g., intense competition and small profit margins within the IT hardware arena that cause vendors to lower their prices for all customers voluntarily to maintain market share). In other words, prices are reduced under the voluntary

provisions of the price reduction clause as a result of market rate pricing changes, not under the mandatory tracking customer provisions.

- Request 19: However, changes in the Federal market have lessened the impact of the tracking customer mechanism over time.

- Request 20: Moreover, due to the various exceptions included in the PRC the tracking customer feature ties pricing for reductions to sales of single items and plays little role in blanket purchase agreement and order purchases reflecting volume sales. Further, many products sold under the FSS program are commercial-off-the-shelf (COTS) products or other commercial items for which the Government is not a market driver. The Government, and other customers in the category to which the Government is most typically aligned under the price reductions clause, tend to receive voluntary price reductions from the vendor as a result of general market forces (e.g., intense competition and small profit margins within the IT hardware arena that cause vendors to lower their prices for all customers voluntarily to maintain market share). In other words, prices are reduced under the voluntary provisions of the price reduction clause as a result of market rate pricing changes, not under the mandatory tracking customer provisions.

- Request 21: GSA recently analyzed modifications issued between October 1, 2013 and August 4, 2014 under nine of its FSS contracts, including Schedule 70 (Information Technology), Schedule 874 (Mission Oriented Business IntegratedSolutions (MOBIS)), Schedule 66 (Scientific Equipment and Services), Schedule 84 (Total Solutions for Law Enforcement, Security, Facilities Management, Fire, Rescue, Clothing, Marine Craft and Emergency/Disaster Response), Schedule 899 (Environmental Services), Schedule 738 II (Language Services), 874 V (Logistics Worldwide), Schedule 871 (Professional Engineering Services), and Schedule 00CORP (The Consolidated Schedule). GSA found that only about 3 percent of the total price reductions received under the price reduction clause were tied to the "tracking customer" feature. The vast majority (approximately 78 percent) came as a result of commercial pricelist adjustments and market rate changes, with the balance for other reasons. This finding supports attempting a different means of making better pricing available.

- Request 22: GSA believes the collection and use of transactional data may be a more efficient and effective way for driving price reductions on FSS buys than through use of the tracking customer mechanism. In addition to avoiding the challenges associated with the tracking customer mechanism described above, the transactional data reporting clause would allow for greater reliance on horizontal pricing in the FSS program so that GSA and its customers can easily evaluate the relative competitiveness of prices between FSS vendors.

(First. Req. [81-7] at 20.)

16

In order to establish liability under the False Claims Act, the Government will need to establish that CA knowingly presented the Government with a false claim that was material. *See* 31 U.S.C. § 3729. "A false statement is material if it 'has a natural tendency to influence agency action or is capable of influencing agency action.'" *United States ex rel. Fago v. M & T Mortg. Corp.*, 518 F. Supp. 2d 108, 118 (D.D.C. 2007) (quoting *United States ex rel Berge v. Bd. of Trs. of the Univ. of Ala.,* 104 F.3d 1453, 1460 (4th Cir. 1997); *see also* 31 U.S.C. § 3729(b)(4).

One of the Government's allegations in its FCA claim is that CA knowingly provided materially false information to the Government by failing to disclose its true pricing information pursuant to the PRC, which resulted in additional false statements and continued overcharges. (IAC ¶¶ 4, 127, 132, 137.) CA claims that the above GSA statements about eliminating the PRC are relevant to CA's defense because, in essence, the statements are concessions that the PRC was not relied upon by the Government or contractors, which undercuts the materiality and knowing elements of the Government's FCA claim. (Def.'s Reply at 22; Dec. 9, 2015 Mot. Hr'g.) Although the undersigned acknowledges that such concessions by GSA would be relevant to CA's defense, the undersigned disagrees that the statements provide such information.

To correct any potential misunderstanding that the excerpts may misleadingly provide when taken out of context, some discussion of the larger proposed rule is necessary. As stated in the proposed rule, GSA's objective is "to obtain the best value for the taxpayer." 80 Fed. Reg. 11619, 11621 (Mar. 4, 2015), attached as Mot. Ex. A [81-3]. GSA's current practice for obtaining the best value involves the CSP / PRC process which uses a "vertical pricing model." *Id.* at 11622. The vertical pricing model means the vendor's price is based on what that

particular vendor has offered to other customers, without consideration to other vendors' prices (*i.e.,* market forces and competition). *Id.*

GSA observed, however, that the Government has frequently received "voluntary price reductions from the vendor as a result of general market forces (*e.g.*, intense competition and small profit margins . . . to maintain market share). In other words, prices are reduced under the voluntary provisions of the price reduction clause as a result of market rate pricing changes, not under the mandatory tracking customer provisions." *Id.* at 11622; *(see also* Produc. Reqs. 18 and 20). In short, even though vendors are not required to consider other vendors' prices under the vertical pricing model, vendors are still considering such information and voluntarily *undercharging* the Government below what the PRC obligates them to provide. *See id.*

Based on this and similar observations, GSA proposes this rule to move from its vertical pricing model to a "horizontal pricing model," whereby contractors would be required to give greater consideration to the relative competiveness of the vendor's prices to other vendors (similar to what GSA observed they had previously been doing voluntarily). *See id.* at 11623. GSA believes this model "may be a more efficient and effective way for driving price reductions on FSS buys than through use of the [PRC's] tracking customer mechanism." *Id.*; (*see also* Produc. Req. 22).

After reading the excerpted statements in context, it becomes clear that CA's argument for why Requests 16 and 18-22 are relevant is a strawman. CA contends that the Government has not relied on the PRC in situations in which the vendors voluntarily *undercharged* the Government below the PRC requirements; however, in such situations, the PRC would not be relied upon because the PRC would not be breached. Moreover, information regarding how vendors have undercharged the Government are irrelevant because "if CA has voluntarily given

the Government deeper discounts than required by its price reduction clause, the Government will not have damages." (Pl.'s Opp. at 14.) This case is about how CA allegedly *overcharged* the Government above the PRC requirements, a topic that the excerpted statements do not address. *See* 80 Fed. Reg. at 11621; (IAC ¶ 69; Produc. Reqs. 18-22.)[4] Although there may be other statements in the proposed rule that are relevant to CA's claim, the production requests that CA currently moves this Court to compel would not reasonably lead to information bearing on CA's defense.

Considerations of proportionality also weigh against compelling the production of Requests 16 and 18-22. GSA has already agreed to produce documents in response to Request 17, which seeks documents relating to any "studies, data, reports, investigations . . . or other information gathered or created by GSA . . . relating to the Price Reduction Clause, including but not limited to the impact and effect of the clause." (Def.'s Reply at 16; *see also* Mot. Ex. J [81-12] at 2.) As acknowledged by Defendant CA, "Requests 16, 18-22 merely seek a subset of these documents—those referenced in or related to the *Federal Register* notice." (Def.'s Reply at 16.) Given that Requests 16 and 18-22 are somewhat duplicative of Request 17, requiring the Government to produce information on this largely irrelevant subset would outweigh its likely benefit and be disproportionate to the needs of the case. Therefore, Requests 16 and 18-22 are denied.

---

[4] If anything, a plain reading of the entire proposed rule seems to reinforce the notion that vendors were *required* to abide by the mandates of the PRC. *See e.g. id.* at 11621 (discussing how under the proposed changes, "[v]endors would not be subject to the 'tracking customer' provisions of the price reduction clause that *require* them to monitor their pricing"); *id.* at 11622 (explaining how under the current system "[c]ontractors are then *required*, under the 'price reductions' clause (PRC), to monitor their pricing over the life of the contract"); *id.* at 11621 (noting that if the results of the transition reveal that using the new model is ineffective, "contracts would be modified *to revert back* to using the tracking customer provisions of the price reductions clause") (emphasis added).

### C.      Requests 26 and 27 are Denied

Requests 26 and 27 seek all documents relating to transactions for which the Government intends to claim damages. (Sec. Req. [81-8] at 7.) The Government claims it cannot respond to these requests until it first receives more information from CA. (Pl.'s Opp. at 2.) CA argues it has already provided sufficient information to the Government and needs this information to develop and prepare its defense. (Def.'s Reply at 7.)

On December 9, 2015, just hours before the Motion's Hearing, Judge Huvelle issued an Order staying discovery for an additional three months to allow the parties to determine a suitable method for analyzing Defendant's sales databases and to engage in continued settlement discussions. (*See* Judge Huvelle Dec. 9, 2015 Order [93].) Given the recency of Judge Huvelle's Order, the undersigned finds that these requests are now premature. Therefore, at this early stage in discovery, Requests 26 and 27 are denied.

## CONCLUSION

For the reasons set forth in this Memorandum Opinion, Defendant's Motion to Compel [81] is granted in part and denied in part. Request 15 is granted. Requests 16, 18-22, 26, and 27 are denied. An Order consistent with this Memorandum Opinion will be issued separately.

DATE: <u>January 6, 2016</u>                    _____<u>/s/</u>_____

                                             ALAN KAY
                                             UNITED STATES MAGISTRATE JUDGE